Case No. 17-3034

[Companioned with Case No. 17-3035]

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.

SHANE COX,
Defendant-Appellant.

On Appeal from the United States District Court
For the District of Kansas (Wichita)
The Honorable Chief Judge J. Thomas Marten
Case No. 6:15-cr-10150-01-JTM

**Appellant's Opening Brief and Required Attachments**

KANSAS FEDERAL PUBLIC DEFENDER
117 SW 6th Street, Suite 200
Topeka, Kansas 66603
Tel: (785) 232-9828
Fax: (785) 232-9886
Email: paige_nichols@fd.org

MELODY BRANNON
Federal Public Defender

PAIGE A. NICHOLS
Assistant Federal Public Defender

Attorneys for Appellant
SHANE COX

**Oral argument is requested.**

# Table of Contents

Table of Cases and Authorities.................................................................... iv

Prior or Related Appeals............................................................................. ix

Jurisdictional Statement .............................................................................. 1

Issues Presented for Review........................................................................ 2

1. Whether Mr. Cox's proffered good-faith mistake-of-law defense is legally cognizable, and whether the district court's instructional and evidentiary rulings blocking this defense violated due process.

2. Whether the National Firearms Act as applied to silencers and short-barreled rifles violates the Second Amendment.

3. Whether the National Firearms Act is a valid exercise of Congressional power—at least as applied to silencers and short-barreled rifles that are made, possessed, and transferred within the State of Kansas.

Statement of the Case ................................................................................. 3

    The Kansas Second Amendment Protection Act........................................ 3
    Shane Cox................................................................................................. 6
    The Federal Prosecution .......................................................................... 10
    Challenges to the National Firearms Act .................................................. 11
    The Battle Over Mr. Cox's Good-Faith Defense....................................... 12
    Sentencing................................................................................................. 17

Argument Summary .................................................................................... 18

Argument..................................................................................................... 19

1. Mr. Cox's good-faith mistake-of-law defense is legally cognizable, and the district court's rulings blocking it violated due process....................... 19

    Issue Raised and Ruled On....................................................................... 19
    Standard of Review................................................................................... 20
    Statutory Background................................................................................ 21
    Discussion................................................................................................. 23

A.  Introduction.................................................................................... 23

B.  The Supreme Court's mistake-of-law cases ......................................... 25

C.  Consistency with Supreme Court jurisprudence and the Model Penal
Code.............................................................................................. 28

D.  The reasonableness of relying on a statute to guide one's conduct................... 30

E.  Traditional reasons that "ignorance of the law is no excuse" ............................ 32

F.  Not inherently immoral.................................................................... 33

G.  The NFA's harsh penalties ............................................................... 35

H.  Conclusion .................................................................................. 35

2.  The National Firearms Act as applied to silencers and short-barreled
rifles violates the Second Amendment............................................... 36

Issue Raised and Ruled On............................................................... 36
Standard of Review........................................................................ 36
Legal Background .......................................................................... 37
Discussion.................................................................................... 38

A.  Prong One: Whether the challenged law imposes a burden on
conduct falling within the scope of the Second Amendment's
guarantee .................................................................................. 40

    (1)  Making and selling protected firearms falls within the Second
    Amendment............................................................................. 40

    (2)  Possession of silencers falls within the Second Amendment...................... 45

    (3)  Possession of short-barreled rifles falls within the Second
    Amendment............................................................................. 47

B.  Prong Two: Whether the NFA survives the appropriate level of
scrutiny ........................................................................................................ 50

C.  Conclusion ........................................................................................................ 52

3.  The National Firearms Act is not a valid exercise of Congressional
power—at least not as applied to silencers and short-barreled rifles that
are made, possessed, and transferred within the State of Kansas. .......................... 52

Issue Raised and Ruled On .................................................................................... 52
Standard of Review ................................................................................................ 52
Discussion .............................................................................................................. 52

Conclusion .................................................................................................................. 54

Oral Argument Statement ........................................................................................... 55

Certificates .................................................................................................................. 56

**Attachments**

1.  Memorandum and Order, R1.34
2.  Memorandum and Order, R1.57
3.  Memorandum and Order, R1.85
4.  Jury Instructions 13, 15, 16, 17, 18, 19, 20
5.  Transcript excerpts containing rulings on jury instructions: R3.110 at 40, 46-50,
    62-64, 66
6.  Transcript excerpts containing oral jury instructions: R3.107 at 83-84; R3.109 at
    93; R3.109 at 134; R3.109 at 135; R3.109 at 150; R3.110 at 88
7.  Judgment, R1.88
8.  K.S.A. 50-1201–K.S.A. 50-1211

# Table of Cases and Authorities

## Cases

*Bailey v. Drexel Furniture Co.*, 259 U.S. 20 (1922)................................................ 54

*Bonidy v. U.S. Postal Service*, 790 F.3d 1121 (10th Cir. 2015) .............................. 37

*California v. Trombetta*, 467 U.S. 479 (1984) ........................................................ 24

*Cox v. Louisiana*, 379 U.S. 559 (1965) ........................................................... passim

*Craig v. Boren*, 429 U.S. 190 (1976) ...................................................................... 43

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................... passim

*Doe v. Albuquerque*, 667 F.3d 1111 (10th Cir. 2012) ...................................... 50, 51

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) ........................................................ 43, 44

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ......................................... 41

*Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51 (1984) ............ 28

*Heien v. North Carolina*, 135 S.Ct. 530 (2014) ..................................................... 31

*Heller v. District of Columbia*, 801 F.3d 264 (D.C. Cir. 2015) ............................. 38

*Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928 (N.D. Ill. 2014) 41

*Johnson v. United States*, 135 S.Ct. 2551 (2015) ................................................. 48

*Liparota v. United States*, 471 U.S. 419 (1985) .................................................... 34

*Mathews v. United States*, 485 U.S. 58 (1988) ................................................ 20, 24

*Michigan v. DeFillippo*, 443 U.S. 31 (1979) ......................................................... 31

*Natl. Fedn. of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) .............................. 53, 54

*Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221 (10th Cir. 2005) .............................. 51

iv

*People v. Ferguson*, 24 P.2d 965 (Cal. App. Div. 2 1933) ..................................................... 33

*Raley v. Ohio*, 360 U.S. 423 (1959) ...............................................................passim

*Roska ex rel. Roska v. Peterson*, 328 F.3d 1230 (10th Cir. 2003) ........................................ 31

*Sonzinsky v. United States*, 300 U.S. 506 (1937) ................................................................... 12

*Staples v. United States*, 511 U.S. 600 (1994) ...........................................................33, 34, 35

*Teixeira v. County of Alameda*, 822 F.3d 1047 (9th Cir. 2016) .............................41, 42, 43

*Teixeira v. County of Alameda*, 854 F.3d 1046 (9th Cir. 2016) ........................................... 41

*Tennyson v. Carpenter*, 558 Fed. Appx. 813 (10th Cir. 2014) ............................................. 51

*United States v. Algarate-Valencia*, 550 F.3d 1238 (10th Cir. 2008) ................................... 20

*United States v. Artez*, 290 Fed. Appx. 203 (10th Cir. 2008) ............................................... 49

*United States v. Buffalo*, 10 F.3d 575 (8th Cir. 1993) .......................................................... 48

*United States v. Cardiff*, 344 U.S. 174 (1952) ...........................................................27, 32

*United States v. Chafin*, 423 Fed. Appx. 342 (4th Cir. 2011) .............................................. 42

*United States v. Cox*, ____ F.3d ____, 2017 WL 411358 (D. Kan. 2017) ........................... 36

*United States v. Graham*, 305 F.3d 1094 (10th Cir. 2002) ................................................... 40

*United States v. Gutierrez-Gonzalez*, 184 F.3d 1160 (10th Cir. 1999) ...........................28, 29

*United States v. Hammond*, 1991 WL 103450 (9th Cir. 1991) ............................................. 48

*United States v. Hardridge*, 379 F.3d 1188 (10th Cir. 2004) ...........................................28, 32

*United States v. Hernandez-Urista*, 9 F.3d 82 (10th Cir. 1993) ........................................... 21

*United States v. Laub*, 385 U.S. 475 (1967) ........................................................................ 35

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ................................................... 41

*United States v. Masciandaro*, 638 F.3d 458 (4th Cir. 2011)....................................................... 38

*United States v. Miller*, 307 U.S. 174 (1939) .......................................................... 49

*United States v. Ortiz*, 804 F.2d 1161 (10th Cir. 1986) ......................................... 24

*United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655 (1973) ......................passim

*United States v. Reese*, 627 F.3d 792 (10th Cir. 2010)....................................passim

*United States v. Scafe*, 822 F.2d 928 (10th Cir. 1987) ......................................... 24

**Statutes**

18 U.S.C. § 3231 ...................................................................................................... 1

18 U.S.C. § 3742 ...................................................................................................... 1

18 U.S.C. § 842(a)(1) .............................................................................................. 40

18 U.S.C. § 922(g)(8) .............................................................................................. 37

18 U.S.C. § 922(d)(3) .............................................................................................. 42

26 U.S.C. § 5801 ...........................................................................................3, 11, 40

26 U.S.C. § 5801(a) ................................................................................................. 21

26 U.S.C. § 5801(b) ................................................................................................. 21

26 U.S.C. § 5802 .....................................................................................11, 22, 40

26 U.S.C. § 5811 ..................................................................................................... 40

26 U.S.C. § 5811(a) ................................................................................................. 22

26 U.S.C. § 5811(b) ................................................................................................. 22

26 U.S.C. § 5812 .....................................................................................10, 11, 40

26 U.S.C. § 5812(a) ................................................................................................. 22

26 U.S.C. § 5812(b) ........................................................................... 22

26 U.S.C. § 5821 ............................................................................... 40

26 U.S.C. § 5821(a) ........................................................................... 22

26 U.S.C. § 5821(b) ........................................................................... 22

26 U.S.C. § 5822 ............................................................................... 11

26 U.S.C. § 5841 ......................................................................10, 11, 40

26 U.S.C. § 5845(a) ........................................................................... 21

26 U.S.C. § 5861(a) ......................................................................11, 22

26 U.S.C. § 5861(d) ......................................................................10, 22

26 U.S.C. § 5861(e) ..................................................................10, 11, 22

26 U.S.C. § 5861(f) ......................................................................11, 22

26 U.S.C. § 5871 ....................................................................10, 11, 22, 35

26 U.S.C. § 7801(a)(2) ....................................................................... 22

26 U.S.C. §5841 ............................................................................... 22

28 U.S.C. § 1291 ................................................................................. 1

K.S.A. 21-6301(a)(4) ........................................................................... 5

K.S.A. 21-6301(h) ............................................................................... 5

K.S.A. 50-1203(b) ............................................................................... 8

K.S.A. 50-1204 ................................................................................. 4

K.S.A. 50-1204(a) ............................................................................. 23

K.S.A. 50-1205 ................................................................................. 8

K.S.A. 50-1206 ............................................................................................. 4

K.S.A. 50-1206(b) ....................................................................................... 23

K.S.A. 50-1207 ........................................................................................ 4, 23

## Other Authorities

10th Cir. R. 28.1(B) ...................................................................................... 6

A.J. Peterman, *Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense*, 97 MARQ. L. REV. 853 (2014) .......................................... 45

David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 HARV. L. REV. F. 230 (2014) .................................................................... 43

Fed. R. App. P. 28(i) ................................................................................ 53, 54

FIREARMS COMMERCE IN THE UNITED STATES 2016 at 15 (US DOJ BATFE 2016), https://www.atf.gov/resource-center/docs/2016-firearms-commerce-united-states/download ................................................................ 48

Gabriel J. Chin, et al., *The Mistake of law Defense and an Unconstitutional Provision of the Model Penal Code*, 93 N.C. L. REV. 139 (2014) ...................... 30

James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493 (2017) .................................... 48, 49

Journal of the Kan. Senate 1011-12 (June 6, 2017), https://perma.cc/A66N-LJ9K ....................................................................... 5

Kan. HB 2199 (as introduced Feb. 1, 2013), https://perma.cc/8EUC-4F97 ............... 3

Kan. SB 102 (2013), https://perma.cc/S2Y3-6CKH ...................................... 4

Kan. SB 254 (introduced June 1, 2017), https://perma.cc/3B2B-9XSE ...................... 5

Kan. SR 1757 (enrolled June 9, 2017), https://perma.cc/VKC5-JYLS ........................ 5

Legislative Summary, SB 102 (Kan. Legis. Research Dept. 2013), https://perma.cc/Q92W-DJAL .......................................................................... 4

Model Penal Code § 2.04 ........................................................................ 30

Model Penal Code § 2.04(3)(b) ............................................................. 30

Nathan Rott, *Debate Over Silencers: Hearing Protection or Public Safety Threat?*,
    ALL THINGS CONSIDERED (NPR Mar. 21, 2017),
    http://www.npr.org/2017/03/21/520953793/debate-over-silencers-
    hearing-protection-or-public-safety-threat .................................................. 47

Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 WESTERN CRIMINOLOGY
    REV. 44, 49-51 (2007),
    http://www.westerncriminology.org/documents/WCR/v08n2/clark.pdf ............. 47

Second Conference Committee Report Brief, Kan. SB 102 (April 4, 2013),
    https://perma.cc/H6CW-AAN4 ................................................................ 6

Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the
Second Amendment*, 46 CUMB. L. REV. 33 (2015-2016) .................................... 46

Thomas Jefferson, 3 WRITINGS 558 (H.A. Washington ed. 1853),
    https://founders.archives.gov/documents/Jefferson/01-26-02-0031 .................. 43

U.S. Const. Amend. II ............................................................................ 37

Wayne R. LaFave, *Ignorance or mistake*, 1 SUBST. CRIM. L. § 5.6(d) (2d ed.
    2016) .............................................................................................. 32, 33

## Prior or Related Appeals

    *United States v. Jeremy Kettler*, Appeal No. 17-3035 (opening brief filed July 21, 2017) (codefendant's companioned direct appeal).

## Jurisdictional Statement

1. This is a direct criminal appeal from federal firearms convictions.

2. The district court had jurisdiction under 18 U.S.C. § 3231.

3. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

4. The filing dates establishing the timeliness of this appeal are:

   Sentencing: February 6, 2017.

   Judgment filed: February 6, 2017.

   Notice of appeal filed: February 16, 2017.

5. This appeal is from a final judgment that disposes of all parties' claims.

**Issues Presented for Review**

1. Whether Mr. Cox's proffered good-faith mistake-of-law defense is legally cognizable, and whether the district court's instructional and evidentiary rulings blocking this defense violated due process.

2. Whether the National Firearms Act as applied to silencers and short-barreled rifles violates the Second Amendment.

3. Whether the National Firearms Act is a valid exercise of Congressional power—at least as applied to silencers and short-barreled rifles that are made, possessed, and transferred within the State of Kansas.

## Statement of the Case

> I am satisfied that you both had a good faith
> belief that you were protected by this statute.
>
> —The Honorable Chief Judge J. Thomas Marten
> R3.112 at 11

This is a direct appeal from eight firearms convictions under the National Firearms Act, 26 U.S.C. § 5801, *et seq.* It is also a test of the adage "ignorance of the law is no excuse." Specifically, this appeal asks whether a credulous civilian may be convicted of a crime for believing what the Kansas legislature, secretary of state, and governor had all declared: that Kansas law protects Kansans from federal prosecution for making, possessing, and transferring unregistered local firearms. This appeal further questions the constitutionality of the National Firearms Act's authorization, registration, and tax burdens on the making, possession, and transfer of silencers and short-barreled rifles.

### The Kansas Second Amendment Protection Act

In 2013, former federal judge John Rubin led a bipartisan group of 50 state representatives in introducing the Kansas Second Amendment Protection Act to the Kansas state legislature. Kan. HB 2199 (as introduced Feb. 1, 2013).[1] After

---

[1] Available at https://perma.cc/8EUC-4F97 (HB 2199 as enrolled embraced a different subject matter; the Second Amendment Protection Act was reintroduced as Senate Bill 102).

3

amendments, the Act purported to do three relevant things. First, it exempted locally made and owned firearms and accessories—including silencers—from federal laws and regulations so long as they stayed within Kansas; second, it prohibited state actors from enforcing "any" federal firearms laws or regulations with respect to locally made and owned firearms; and third, it made it a felony for federal actors to enforce "any" federal firearms laws or regulations with respect to local firearms. Kan. SB 102 (2013)[2] (codified at K.S.A. 50-1201 through K.S.A. 50-1211; attached hereto as codified).

A sophisticated legal reader might notice at least two oddities in the Act. Some of its references to federal laws appear limited to laws passed "under the authority of congress to regulate interstate commerce," *see* K.S.A. 50-1204, while others are wholly unlimited, *see* K.S.A. 50-1206, K.S.A. 50-1207. This internal inconsistency notwithstanding, the Act was publicly touted as declaring all locally made and owned firearms and accessories beyond the reach of any federal regulation or law, period. *See, e.g.,* Legislative Summary, SB 102 (Kan. Legis. Research Dept. 2013) ("The bill provides that for as long as any such personal firearm, firearm accessory, or ammunition [made and owned in Kansas] remains within the borders of Kansas, it is not subject to any federal law, regulation, or authority.");[3] Supp. R.1 Exh. E,

---

[2] Available at https://perma.cc/S2Y3-6CKH.

[3] Available at https://perma.cc/Q92W-DJAL.

Statement of Kansas Secretary of State Kris Kobach (May 2, 2013) ("SB 102 states that a firearm that is assembled in Kansas, that is stamped 'Made in Kansas,' and that never leaves the State of Kansas is not subject to regulation by the federal government.").[4]

Additionally, while the Act itself expressly protects the local making and possession of unregistered silencers from federal prosecution, Kansas law elsewhere makes it a state crime to possess an unregistered silencer. *See* K.S.A. 21-6301(a)(4), (h). A Kansas Senate resolution this year declared that this provision was left unchanged "due to an oversight," Kan. SR 1757 (enrolled June 9, 2017),[5] and a bill has now been introduced to correct this oversight, Kan. SB 254 (introduced June 1, 2017).[6]

These oddities aside, the Kansas Second Amendment Protection Act passed by a large bipartisan majority in each chamber of the Kansas legislature (35-4 in the Kansas Senate, and 96-24 in the Kansas House), with the active support of Kansas Secretary

---

[4] The State of Kansas has argued that the Act "focuses on the limitations on Congress's Commerce Power," and therefore the NFA—enacted under Congress's taxing power—does not implicate the Act. *United States v. Kettler*, companioned Case No. 17-3035, Br. of Intervenor State of Kansas at 8-9, 12 (filed July 21, 2017). This view is inconsistent with the Act's prohibition on the enforcement of "any" federal law or regulation in cases involving local firearms.

[5] Available at https://perma.cc/VKC5-JYLS; *see also* Journal of the Kan. Senate 1011-12 (June 6, 2017), available at https://perma.cc/A66N-LJ9K.

[6] Available at https://perma.cc/3B2B-9XSE.

of State Kris Kobach (in his personal capacity) and many others,[7] and it was approved by Governor Sam Brownback in April of 2013.[8]

## Shane Cox

Shane Cox is, in his own words, "just a shy guy" who lives "off in the sticks" of Petrolia, Kansas. R3.109 at 115.[9] As a boy, Mr. Cox liked military weapons and was voted "most likely to go in the Army" by his classmates. *Id.* at 116-17. But his dream of joining the military ended in high school when he was rejected by the Marines

---

[7] *See* Second Conference Committee Report Brief, Kan. SB 102 (April 4, 2013), available at https://perma.cc/H6CW-AAN4.

[8] SB 102 history and links available at http://www.kslegislature.org/li_2014/b2013_14/measures/sb102/ (last visited July 5, 2017).

[9] Our citations will take the following form:



*See* 10th Cir. R. 28.1(B). We will identify document type if not obvious from the text. The four volumes of trial transcripts are consecutively paginated. We will refer to the page numbers that appear in the blue line of text at the top of the page, and start at page 1 for each volume. Thus, page 1 of volume 4 of the trial transcript will be R3.110 at 1, and *not* R3.110 at 540.

6

because of a hearing loss he had suffered as a child. *Id.* at 117. And so he stayed put in rural Kansas, raised two children, worked locally as a hay cutter and a welder, and learned his way around a machine shop. *Id.* at 115-20.

When the opportunity arose, Mr. Cox and his daughter (now a Marine herself) opened up an army surplus store in Chanute, Kansas. *Id.* at 120-21. They offered the usual stock: duffle bags, pepper spray, stun guns, knives, rifle kits, dummy grenades, and military clothing. *Id.* at 122-25. Mr. Cox was financially conservative when it came to the store. For instance, he sold earplugs but not earmuffs, because the earmuffs were not financially feasible. *Id.* at 139-41. And Mr. Cox did not have a federal firearms license—he wasn't interested in dealing on that level "because of the red tape, the money involved"—so he only stocked gun parts and other items that he could legally sell without a license. *Id.* at 122-23.

At some point after Governor Brownback approved the Kansas Second Amendment Protection Act, Mr. Cox began to hear talk in the store about the Act and the "Kansas legal suppressors" that guys who passed through town were boasting of making. *Id.* at 128. Intrigued, he asked local law enforcement whether the law was valid. *Id.* at 129. The answer was encouraging: "There was no issues, Kansas law, you know constitutionally valid and everything, it's a legal—it's a good law." *Id.* Satisfied that he was within his rights, Mr. Cox made a short-barreled rifle for himself and stamped it "Made in Kansas," as required by the Act. *Id.* at 129, 132-33, 135; *see also*

7

K.S.A. 50-1205 (requiring makers to stamp "Made in Kansas" on all locally made firearms).[10] And he taught himself how to build an effective silencer. R3.109 at 131-32. He knew silencers could be a popular item in the store. They not only protect hearing; they enhance sport shooting pleasure. *Id.* at 143. The alternatives of earmuffs and earplugs can get in the way of shooting, be uncomfortable, and impede conversation with companions. *Id.* But despite silencers' marketability, Mr. Cox would never have made them or sold them had he not believed doing so was legal under the Kansas Act: "Because of the red tape involved and in all of the—and I just wasn't as interested, you know. It—it hadn't occurred to me to—to pursue making suppressors, you know, I had never made one before this—this law." *Id.* at 131. He displayed the silencers in a glass case alongside a copy of the Kansas Act. R3.110 at 10. He advertised them as "legal suppressors" on the store's Facebook page, where he also discussed the Kansas Act: "After SB 102 was passed you can make your own firearm in Kansas without any background checks, permits, et cetera. The way we read the new law you can build a short barreled suppressed AR-15 in Kansas without any fed red tape." R3.108 at 79.

---

[10] The Act requires this stamp only on "firearms," not on "accessories," which the Act defines to include silencers. K.S.A. 50-1205; K.S.A. 50-1203(b).

8

As it turned out, Mr. Cox had a talent for building silencers. A federal firearms enforcement officer would later describe his silencers as similar to "commercial grade" and "very well made." R3.109 at 37-38. Word spread—in part through an enthusiastic online review by customer (and later codefendant) Jeremy Kettler, R3.108 at 35-37—and orders began to roll in, including one from a local law-enforcement officer. R3.108 at 86-87.[11] When customer Jason Gardner talked with Mr. Cox about the silencers, he found Mr. Cox "very open" and unconcerned in his discussion. R3.109 at 64, 81. Mr. Cox showed Mr. Gardner a copy of the Kansas Act, and it was clear to Mr. Gardner that "Mr. Cox thought that what he was doing was protected by state law" notwithstanding federal law. *Id.* at 65, 77. Mr. Cox invited Mr. Gardner out to his house and shooting range in Petrolia where he finished Mr. Gardner's silencer, charged him $625.00 plus sales tax, and gave him a receipt. *Id.* at 59, 81-82, 116; Supp. R.1 Exh. 11-A (receipt). All told, Mr. Cox believed that he sold silencers to seven or eight customers, at prices increasing from $275.00 to $625.00 as he perfected the product over time. *Id.* at 142; R3.108 at 35; Supp. R.1 Exh. 1-D.

---

[11] This officer threw the silencer Mr. Cox made for him into a river when he learned of the federal investigation. R3.108 at 86-87. But he was never charged either for possessing the silencer or for obstructing justice. *Id.*

### The Federal Prosecution

As Mr. Cox would later learn, customer Jason Gardner was really Jason Fuller, a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives. R3.109 at 55-57. Someone had called the ATF in December 2014 to report that Mr. Cox was making silencers and selling them at his store. R3.108 at 28-29. ATF agents "simply Googled the information" and easily found the store's Facebook page. *Id.* at 29. The ensuing investigation culminated in an indictment charging Mr. Cox and Mr. Kettler with various crimes under the National Firearms act. A jury eventually convicted Mr. Cox of the following eight crimes:

| Count Three | Possession of unregistered firearm (short-barreled rifle) | 26 U.S.C. § 5841<br>26 U.S.C. § 5861(d)<br>26 U.S.C. § 5871 |
|---|---|---|
| Count Six | Transfer of unregistered firearm (silencer) | 26 U.S.C. § 5812<br>26 U.S.C. § 5841<br>26 U.S.C. § 5861(e)<br>26 U.S.C. § 5871 |
| Count Seven | Transfer of unregistered firearm (silencer) | 26 U.S.C. § 5812<br>26 U.S.C. § 5841<br>26 U.S.C. § 5861(e)<br>26 U.S.C. § 5871 |
| Count Eight | Transfer of unregistered firearm (silencer) | 26 U.S.C. § 5812<br>26 U.S.C. § 5841<br>26 U.S.C. § 5861(e)<br>26 U.S.C. § 5871 |
| Count Nine | Transfer of unregistered firearm (silencer) | 26 U.S.C. § 5812<br>26 U.S.C. § 5841<br>26 U.S.C. § 5861(e)<br>26 U.S.C. § 5871 |

| Count Ten | Making of unregistered firearm (silencer) | 26 U.S.C. § 5822<br>26 U.S.C. § 5841<br>26 U.S.C. § 5861(f)<br>26 U.S.C. § 5871 |
| Count Eleven | Transfer of unregistered firearm (silencer) | 26 U.S.C. § 5812<br>26 U.S.C. § 5841<br>26 U.S.C. § 5861(e)<br>26 U.S.C. § 5871 |
| Count Twelve | Engaging in manufacturing and dealing firearms (silencers) without tax or registration | 26 U.S.C. § 5801<br>26 U.S.C. § 5802<br>26 U.S.C. § 5861(a)<br>26 U.S.C. § 5871 |

R1.27 (first superseding indictment); R1.71 at 1-2 (jury verdict).[12] Mr. Kettler was convicted on a single count of unlawfully possessing an unregistered silencer (the silencer he bought from Mr. Cox). R1.71 at 3.

### Challenges to the National Firearms Act

Before trial, Mr. Cox moved to dismiss the charges, arguing that the National Firearms Act is an unconstitutional exercise of Congress's taxing power, R1.29 at 4-13, and cannot be upheld under the Commerce Clause, R1.29 at 13-25. He acknowledged the Supreme Court's 1937 decision upholding the Act under Congress's taxing power, but argued that changes to the Act since then had stripped it

---

[12] The government also charged Mr. Cox with conspiring with Mr. Kettler to violate the National Firearms Act, and with possessing unregistered explosive devices. R1.27 at 2-4. The district court granted the defendants' motion for judgment of acquittal on the conspiracy charge, and the jury acquitted Mr. Cox on the explosive-device charges. R3.109 at 161; R1.71 at 1.

of any real tax character. R1.29 at 10-11 (discussing *Sonzinsky v. United States*, 300 U.S. 506 (1937)). He argued that the Act failed as well under the Commerce Clause when applied to intrastate conduct. R1.29 at 13-21. The district court denied the motion, finding itself bound by *Sonzinsky* to uphold the Act under Congress's taxing power. R1.34 at 4-8. The district court did not reach the Commerce Clause argument. *Id.* at 8.

Mr. Cox also moved to dismiss the charges on Second Amendment grounds. R1.78 at 3-11. He argued that the NFA targets conduct protected by the Second Amendment, and that its provisions cannot withstand constitutional scrutiny. *Id.* The district court denied this motion as well. R1.85 at 7-11. The district court held that silencers and short-barreled rifles are not protected by the Second Amendment; the district court thus did not subject the NFA to any level of constitutional scrutiny. *Id.*

### The Battle Over Mr. Cox's Good-Faith Defense

It was clear from the outset of the case that both Mr. Cox and Mr. Kettler intended to defend their conduct by invoking Kansas's Second Amendment Protection Act. The government therefore moved before trial for an order finding "that any defense based on Kansas'[s] enactment of the Second Amendment Protection Act . . . is not a valid legal defense," and prohibiting the defendants from using the Act "as a defense to any count of the pending indictment." R1.39 at 1, 7.

At a hearing on the government's motion, the district court granted the motion over an initial objection from Mr. Kettler "absent some proffer by you of exactly what

evidence it is that you wish to offer, or argument that you wish to make." R3.111 at

19. Mr. Cox's counsel then proffered evidence that Mr. Cox was selling the silencers

he made with the Kansas Act on display, "indicating that he was in compliance with

the law," and argued that "I thought there may still be an application for a good faith

instruction in this." *Id.* at 15-16. The district court reflexively rejected this theory of

defense: "*Mens rea*, again, did they knowingly sell silencers? Is that

a—unregistered? Is that a violation of federal law? That is really the crux of the whole

thing. It's not, I didn't mean to break the law." *Id.* at 16. But the district court

suggested that counsel put his legal position in a motion along with a proffer. *Id.*

 After the hearing, Mr. Kettler filed a proffer with supporting arguments. R1.48. He

proposed to present evidence that Mr. Cox handed out copies of the Kansas Act with

the silencers; that Mr. Kettler relied on the Kansas Act "to believe that he was not in

violation of any laws"; and similar evidence of Mr. Kettler's "good faith belief that he

was not violating the law." *Id.* at 6-7. He argued that due process necessitated

admission and the jury's consideration of this evidence: "It is a violation of due

process to prosecute Mr. Kettler for doing exactly, and only, what the [Kansas Act]

promised him he could do legally, without allowing the Jury to address the issue of

whether he knew he was violating the law." *Id.* at 3-4. Mr. Cox moved to join Mr.

Kettler's proffer and arguments, noting that admission of the proffered evidence was

"necessary as a matter of due process." R1.50 at 1. The district court granted the

requested joinder. R1.57 at 4.

The district court also granted the defendants' request to present *some* evidence of

the existence of the Kansas Act and the defendants' reliance on it, finding that this

evidence "may be admissible as part of the *res gestae* of the offenses." R1.57 at 3. But

the district court held that the jury could not *consider* the evidence, reiterating its

opinion that the defendants' good-faith belief in the legality of their conduct was not a

defense: "In sum, defendants' asserted belief that federal law did not prohibit the

transfer of such firearms does not negate the *mens rea* required for commission of any

of the offenses charged in the indictment." *Id.* The district court further held that

when evidence of the Kansas Act came in, the court would instruct the jury "that the

offenses charged do not require proof that a defendant knew that what he was doing

was prohibited by federal law," and that reliance on the Kansas Act "is not a defense

to the charges in the indictment." *Id.* at 3-4.

At trial, the district court restated this ruling, emphasizing that while defense

counsel could introduce evidence of their clients' awareness of the Kansas Act, they

"cannot make the argument that their clients relied on it," and "as soon as it comes

up, I'm going to instruct the jury that it's not a defense." R3.107 at 8-9. The district

court then gave a version of this instruction to the jurors no fewer than six times

throughout the trial, including during jury selection, during the presentation of

14

evidence, and in the court's final instructions packet. R3.107 at 83-84; R3.109 at 93; R3.109 at 134; R3.109 at 135; R3.109 at 150; R3.110 at 88; R1.74 at 23.

During trial, Mr. Cox proffered into evidence the Kansas Senate Bill adopting the Kansas Second Amendment Protection Act that Mr. Cox kept on display in his store, as well as a copy of the Act as codified. R3.109 at 66-68; Supp. R.1 Exhs. B, C. The district court excluded these exhibits, again holding that Mr. Cox and Mr. Kettler "may very well have thought utmost good faith that what they were doing was fine . . . but that's not the decision that the jury's going to make. It's not a question of whether they intended to violate the law, it's a question of whether they intended to manufacture silencers." R3.109 at 68. Acknowledging the district court's ruling, counsel for Mr. Cox "withdrew" one of the proffered exhibits. *Id.* at 70. But he clarified that he merely meant that he understood that the court was not going to admit the exhibits, but he intended to preserve the proffer for the record. *Id.* at 72-73.

During trial, Mr. Cox asked the district court to give the jury a good-faith instruction that recited part of the Kansas Act and included the following language:

> It is a complete defense to these charges alleging defendant's conduct was unlawful if you find that defendant acted in 'good faith.' A person acts in 'good faith' when he has an honestly held belief, opinion, or understanding that the Kansas Second Amendment Protection Act controlled over federal law, even though the belief, opinion, or understanding turns out to be inaccurate or incorrect.

15

R1.62 at 9-10; *see also* R1.62 at 11-18 (memorandum of law); R3.110 at 43-45 (oral argument). The district court declined to include the instruction. R3.110 at 40, 46-50. The district court emphasized that it was "not unsympathetic" to the defendants. *Id.* "My personal view is that Mr. Cox has some skills, I think he did believe that this statute gave him cover or he wouldn't have been making these things," the district court observed, "but the old saying that ignorance of law and even confusion over what the law is, you know, if there is any issue at all, you act at your risk in terms of potential prosecution, and I think that's just where we are here." *Id.* at 48-49.

The district court then proposed to instruct the jury on the possession and transfer counts (Counts 3, 6-9, and 11) that "[t]he government is not required to prove that the defendant knew that the firearm was not registered or had to be registered." R1.74 at 15, 18 (Instructions 13 and 15). Counsel for Mr. Cox objected that this was inconsistent with Mr. Cox's proffered good-faith defense and with the *mens rea* required by due process. R3.110 at 42-43, 45, 62-64. The district court overruled the objections and gave the instructions as proposed. R3.110 at 62-64; R1.74 at 15-18. Counsel further requested a knowledge-of-unlawfulness instruction on the making and engaging counts (Counts 10 and 12). R3.110 at 63. The district court overruled this request and gave the instructions without any such *mens rea* requirement. *Id.* R1.74 at 19-21 (Instructions 16 and 17). The district court also, and again over defense counsel's objections, (1) gave a general knowledge instruction stating that "[t]he

16

government is not required to prove that a defendant knew that his acts were unlawful," R3.110 at 64; R1.74 at 22 (Instruction 18); and (2) instructed the jury that the Kansas Second Amendment Protection Act was not a defense to the charges, R3.110 at 64-66; R1.74 at 23 (Instruction 19). Finally, the district court overruled counsel for Mr. Cox's request that a good-faith instruction be added to the general intent instruction. R3.110 at 66; R1.74 at 24 (Instruction 20).

On the instructions given, and having heard the evidence described above, the jury convicted Mr. Cox of the crimes listed at pages 10-11 above.

## Sentencing

Mr. Cox's presentence report calculated his total offense level to be 28. R2.84 at 14. In his criminal history category (I), Mr. Cox faced an advisory sentencing range of 78-97 months' imprisonment. *Id.* at 21. At sentencing, the district court announced its intention to place Mr. Cox on probation for two years. R3.112 at 10. The district court explained: "I do believe, and while the Second Amendment Protection Act was not available to you as a defense in this case, it is a factor that I can take into account in your sentencing and I believe that you both honestly felt that you were protected by this Act and I believe that to be so." *Id.*; *see also id.* at 11 ("I am satisfied that you both had a good faith belief that you were protected by this statute."). The government stated that it had no objection to the proposed probationary sentence, *id.* at 12, and that is the sentence the district court imposed, R1.88 at 3. This timely appeal followed.

17

## Argument Summary

Mr. Cox's proffered good-faith defense is legally cognizable. We propose here that this Court recognize a narrow defense limited to rare cases such as this: When the accused's conduct is subject to facially conflicting state and federal laws, and the state law has not (yet) been held inapplicable, inferior, or illegitimate by any court, the accused's good-faith reliance on the state law is a complete defense to criminal charges brought under the federal law. This defense is consistent with well-established principles of due process, notice, and fairness, and the district court's instructional and evidentiary rulings blocking this defense violated Mr. Cox's due-process rights.

We argue as well that the National Firearms Act as applied to silencers and short-barreled rifles violates the Second Amendment. These firearms fall within the scope of the Second Amendment's protections, and the government has made no effort to show (and the district court did not find) that the burdens imposed by the NFA with respect to these firearms survive scrutiny. This Court should thus invalidate the NFA or remand this case for further proceedings.

Lastly, we adopt and expand on arguments raised in codefendant Jeremy Kettler's brief and the State of Kansas's brief that the National Firearms Act is not a valid exercise of Congress's taxing power, and may not be upheld under the Commerce Clause—at least as applied to silencers and short-barreled rifles that are made, possessed, and transferred within the State of Kansas.

18

# Argument

1. **Mr. Cox's good-faith mistake-of-law defense is legally cognizable, and the district court's rulings blocking it violated due process.**

**Issue raised and ruled on**

Mr. Cox invoked his good-faith reliance on the Kansas Act as a defense and sought evidentiary and instructional rulings in support of this defense at several points throughout the proceedings:

| Issue raised | Where raised | Ruling/result |
|---|---|---|
| Request to present and argue good-faith reliance on Kansas Act | R3.111 at 15-16 (motions hearing); R1.48 (Mr. Kettler's proffer); R1.50 (Mr. Cox's motion to join Mr. Kettler's proffer) | Request to present some evidence granted; but jury may not consider it, and will be instructed that good faith is not a defense, R1.57; R3.107 at 8-9 |
| Request to introduce Kansas Bill and Act | R3.109 at 66-68, 72-73; Supp. R.1 Exhs. B, C | Request overruled at R3.109 at 68 |
| Request for good-faith instruction | R1.62 at 9-10 (requested instruction); R1.62 at 11-18 (memorandum of law); R3.110 at 43-45, 66 (instructions conference) | No good-faith instruction given; request overruled at R3.110 at 40, 46-50, 66 |
| Requests for instructions that government must prove knowledge of unlawfulness; and objections to instructions stating the opposite | R3.110 at 42-43, 45, 62-64 | Instruction 13, R1.74 at 15 Instruction 15, R1.74 at 18 Instruction 16, R1.74 at 19 Instruction 17, R1.74 at 20 Instruction 18, R1.74 at 22 Objections overruled at R3.110 at 62-64 |
| Objections to instructions that Kansas Act not a defense | * See below; *see also* R3.110 at 66 (objections to Instruction 20) | R3.107 at 83-84; R3.109 at 93; R3.109 at 134; R3.109 at 135; R3.109 at 150; R3.110 at 88; Instruction 20, R1.74 at 24 |

\* Counsel for Mr. Cox did not contemporaneously object to each instance of the district court's many oral instructions that Mr. Cox's reliance on the Kansas Act was not a defense. But by the time the district court gave those instructions, the district court was well aware of the defense position, and it is plain that any further objections would have been futile. *See* R1.57 at 3-4 (written pretrial order denying request to present good-faith defense); R3.107 at 8-9 (oral order before jury selection restating pretrial order). This Court may therefore treat Mr. Cox's objections to these instructions as fully preserved. *See United States v. Algarate-Valencia*, 550 F.3d 1238, 1243 n.4 (10th Cir. 2008).

**Standard of review**

"As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). Here, the district court indicated that the second element of this proposition existed, i.e., that there was sufficient evidence for a reasonable jury to find that Mr. Cox acted in good-faith reliance on the Kansas Act. *See* R3.110 at 48-49 (district court at instructions conference: "I think he did believe that this statute gave him cover or he wouldn't have been making these things"); *see also* R3.112 at 11 (district court at sentencing: "I am satisfied that you both had a good faith belief that you were protected by this statute"). But the district court did not believe that the first element was fulfilled, i.e.,

20

that a good-faith belief in the lawfulness of one's conduct is a cognizable defense to charges under the National Firearms Act. R1.57 at 1-3; R3.110 at 48-49. This legal conclusion was the basis for all of the district court's evidentiary and instructional decisions listed above. Whether a particular defense is legally cognizable is a question that this Court reviews de novo. *See United States v. Hernandez-Urista*, 9 F.3d 82, 83 (10th Cir. 1993) (reviewing de novo whether to extend good-faith mistake-of-law defense to drug offenses).

**Statutory background**

Federal law criminalizes making, transferring, and possessing unregistered firearms, while Kansas law declares this same conduct both legal and protected from federal prosecution when it involves locally made firearms and accessories that stay within the borders of Kansas. The conflicting statutory language is as follows:

The National Firearms Act provides in relevant part:

1. "Firearms" means, among other things, "a rifle having a barrel or barrels of less than 16 inches in length," and "any silencer." 26 U.S.C. § 5845(a).

2. Firearms manufacturers must pay an occupational tax of $1,000 a year ($500 a year for small manufacturers). 26 U.S.C. § 5801(a), (b).

3. Firearms dealers must pay an occupational tax of $500 a year. 26 U.S.C. § 5801(a).

4. Firearms manufacturers and dealers must register with the "Secretary," i.e., the Attorney General.[13] 26 U.S.C. § 5802.

5. Firearms manufacturers must pay a $200 tax for each firearm made. 26 U.S.C. § 5821(a), (b).

6. Firearms transferors must pay a $200 tax for each firearm transferred. 26 U.S.C. § 5811(a), (b).

7. Firearms manufacturers and transferors must secure approval and registration from the Attorney General before making or transferring a firearm. 26 U.S.C. § 5812(a), (b); 26 U.S.C. §5841.

8. "It shall be unlawful for any person—"

   a. "to engage in business as a manufacturer . . . or dealer in, firearms without having paid the special (occupational) tax required by section 5801 for his business or having registered as required by section 5802," 26 U.S.C. § 5861(a) (the basis for Count 12);

   b. "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record," 26 U.S.C. § 5861(d) (the basis for Count 3);

   c. "to transfer a firearm in violation of the provisions of this chapter," 26 U.S.C. § 5861(e) (the basis for Counts 6, 7, 8, 9, and 11); or

   d. "to make a firearm in violation of the provisions of this chapter," 26 U.S.C. § 5861(f) (the basis for Count 10).

9. "Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both." 26 U.S.C. § 5871.

---

[13] "Secretary" as used in the NFA means the Attorney General. 26 U.S.C. § 7801(a)(2).

22

The Kansas Second Amendment Protection Act, in contrast, provides in relevant part:

1. "A personal firearm, a firearm accessory or ammunition that is manufactured commercially or privately and owned in Kansas and that remains within the borders of Kansas is not subject to any federal law, treaty, federal regulation, or federal executive action, including any federal firearm or ammunition registration program, under the authority of congress to regulate interstate commerce. It is declared by the legislature that those items have not traveled in interstate commerce. This section applies to a firearm, a firearm accessory or ammunition that is manufactured commercially or privately and owned in the state of Kansas." K.S.A. 50-1204(a).

2. "No official, agent or employee of the state of Kansas, or any political subdivision thereof, shall enforce or attempt to enforce any act, law, treaty, order, rule or regulation of the government of the United States regarding any personal firearm, firearm accessory or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains within the borders of Kansas." K.S.A. 50-1206(b).

3. "It is unlawful for any official, agent or employee of the government of the United States, or employee of a corporation providing services to the government of the United States to enforce or attempt to enforce any act, law, treaty, order, rule or regulation of the government of the United States regarding a firearm, a firearm accessory, or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains within the borders of Kansas. Violation of this section is a severity level 10 nonperson felony." K.S.A. 50-1207.

**Discussion**

**A. Introduction**

Constitutional principles of due process require that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *California v.*

*Trombetta*, 467 U.S. 479, 485 (1984). It is thus "well established that a defendant is entitled to have a jury consider any defense which is supported by the law and has sufficient foundation in the evidence to create a genuine issue of fact." *United States v. Ortiz*, 804 F.2d 1161, 1163 (10th Cir. 1986). "This right is so important that the failure to allow a defendant to present a theory of defense which is supported by sufficient evidence is reversible error." *Id.* at 1163-64. Similarly, "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). "Failure to so instruct is reversible error." *United States v. Scafe*, 822 F.2d 928, 932 (10th Cir. 1987).

The defense we ask this Court to recognize is a narrow one limited to rare cases such as this: When the accused's conduct is subject to facially conflicting state and federal laws, and the state law has not (yet) been held inapplicable, inferior, or illegitimate by any court, the accused's good-faith reliance on the state law is a complete defense to criminal charges brought under the federal law. For reasons that will be detailed below, we propose this good-faith mistake-of-law defense as an exception to the usual rule that "ignorance of the law is no excuse." If this Court finds this defense cognizable, then only one short step further is required to find that the district court's instructional and evidentiary rulings blocking this defense violated Mr. Cox's due-process rights.

24

## B. The Supreme Court's mistake-of-law cases

Mistakes of law attributable to the advice of certain officials have long been recognized as a defense to criminal charges, regardless of the charged crime's required *mens rea*. *See United States v. Pennsylvania Indus. Chem. Corp.*, 411 U.S. 655 (1973); *Cox v. Louisiana*, 379 U.S. 559 (1965); *Raley v. Ohio*, 360 U.S. 423 (1959). The due-process, notice, and fairness underpinnings of these cases lend strong support to our proposed defense.

In *Pennsylvania Indus. Chem. Corp.* (PICCO), the government charged a manufacturing corporation with pollution (discharging industrial refuse into a river without a permit) under the Rivers and Harbors Act. 411 U.S. at 658-59. The district court refused to permit PICCO to present evidence at trial that it had relied on longstanding Army Corps of Engineers regulations, and "that it was affirmatively misled . . . into believing that the law did not apply in this situation." *Id.* at 673-74. The Third Circuit reversed, and the Supreme Court affirmed: "[T]o the extent that the regulations deprived PICCO of fair warning as to what conduct the Government intended to make criminal, we think there can be no doubt that traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding with the prosecution." *Id.* at 674.

In *Cox*, demonstrators were told by "the highest police officials of the city, in the presence of the Sheriff and Mayor" that they could hold a demonstration across the

street from a courthouse. 379 U.S. at 571. Defendant Cox was thereafter arrested,

prosecuted, and convicted for violating a state anti-picketing statute. The Supreme

Court held that "[t]he Due Process Clause does not permit convictions to be obtained

under such circumstances." *Id.* The Court explained that "to sustain appellant's later

conviction for demonstrating where they told him he could 'would be to sanction an

indefensible sort of entrapment by the State—convicting a citizen for exercising a

privilege which the State had clearly told him was available to him.'" *Id.* (citing *Raley*).

In *Raley*, the Supreme Court reversed the contempt convictions of three witnesses

on similar grounds. The witnesses had been told by a state legislative "Un-American

Activities Commission" before which they had been summoned that they had a right

to rely on their privilege against self-incrimination. This advice was incorrect—state

law in fact deprived them of the privilege by immunizing their testimony. The state

thereafter prosecuted the witnesses for contempt. On review, the Supreme Court

found "no suggestion that the Commission had any intent to deceive the appellants,"

but held nonetheless that affirming the convictions "after the Commission had acted

as it did would be to sanction the most indefensible sort of entrapment by the State—

convicting a citizen for exercising a privilege which the State clearly had told him was

available to him." 360 U.S. at 438. Pointing out that the witnesses had been subjected

to "active misleading" by "the voice of the State most presently speaking" to them,

the Court concluded that "[w]e cannot hold that the Due process clause permits

convictions to be obtained under such circumstances." *Id.* at 439. The *Raley* decision was driven in part by *United States v. Cardiff*, 344 U.S. 174 (1952). 360 U.S. at 438. In *Cardiff*, the Supreme Court affirmed the vacation of a conviction under the Federal Food, Drug, and Cosmetic Act, because the Act at the time gave "conflicting commands." 344 U.S. at 176. It made inspection of a covered factory dependent on the owner or custodian's consent, but it also made refusal to allow inspection a crime. *Id.* This was "not fair warning," declared the Court. *Id.* "We cannot sanction taking a man by the heels for refusing to grant the permission which this Act on its face apparently gave him the right to withhold." *Id.* at 176-77.

The circumstances leading to Mr. Cox's conviction bear similar marks of unfairness: His highest state officials led him to believe that his conduct was legal by adopting a statutory scheme that on its face apparently gave him the right to make, possess, and transfer firearms within the State of Kansas, free from federal regulation or prosecution. This Court has in other contexts limited the mistake-of-law defense to situations in which the person or entity on whose advice the defendant relied was "responsible for interpreting, administering, or enforcing the law defining the

27

offense." *United States v. Hardridge*, 379 F.3d 1188, 1192 (10th Cir. 2004). [14] For

instance, this Court has declined to extend the defense to a defendant who claimed to

have been misled by a state police officer about his federal gun rights. *Id.* at 1195-96.

Admittedly, neither the Kansas legislature, nor the Kansas governor, nor the

Kansas Secretary of State is "responsible for interpreting, administering, or enforcing"

the National Firearms Act. But a number of factors weigh in favor of recognizing Mr.

Cox's good-faith reliance on the Kansas Act—not just an official, but a *statute*—as a

due-process defense to the NFA charges here.

## C. Consistency with Supreme Court jurisprudence and the Model Penal Code

When this Court first narrowed this mistake-of-law defense as described above, it

did so in reliance on *PICCO*, *Cox*, and *Raley*. *United States v. Gutierrez-Gonzalez*, 184

F.3d 1160, 1166-67 (10th Cir. 1999). The Supreme Court held in each of those cases

that advice from an official or agency responsible for administering or enforcing the

law at issue was sufficient to justify the defendant's reliance and prevent prosecution

on due-process grounds. *See, e.g., PICCO*, 411 U.S. at 674 ("[T]here can be no question

---

[14] This Court calls this defense "entrapment by estoppel." *Id.* This is a bit of a
misnomer. The defense is not quite one of entrapment or estoppel, but "at heart a
due process challenge." *Id.*; *accord Heckler v. Community Health Services of Crawford County,
Inc.*, 467 U.S. 51, 68 (1984) (noting that *PICCO* was "not [a] traditional equitable
estoppel case[ ]," but rather about "traditional notions of fairness inherent in our
system of criminal justice") (Rehnquist, J., concurring).

that PICCO had a right to look to the Corps of Engineers' regulations for guidance. The Corps is the responsible administrative agency under the 1899 Act, and 'the rulings, interpretations and opinions of the (responsible agency) . . . , while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which . . . litigants may properly resort for guidance.'") (citation omitted). But the Supreme Court has never held that any particular advisor identity is necessary for a due-process defense such as Mr. Cox's, that is, when the advice relied on takes the form of a statute.

This Court in *Gutierrez-Gonzalez* also relied on the Model Penal Code. 184 F.3d at 1167-68 (quoting "Model Penal Code § 3(b)(iv)").[15] The section referenced requires that an advisor who is an individual official be the one responsible for interpreting, administering, or enforcing the relevant law. But this identity is not required when the advisor is an entire state legislature that has enshrined its advice in a statute:

> (3) A belief that conduct does not legally constitute an offense is a defense to a prosecution for that offense based upon such conduct when:
>
> * * *
>
> (b) he acts in reasonable reliance upon an official statement of the law, afterward determined to be invalid or erroneous, contained in (i) *a statute or other enactment*; (ii) a judicial decision, opinion or judgment; (iii) an

_____

[15] The reference to Section 3 is a mistake. The language quoted is from Section 2.04.

29

administrative order or grant of permission; or (iv) an official
interpretation of the public officer or body charged by law with
responsibility for the interpretation, administration or enforcement of
the law defining the offense.

Model Penal Code § 2.04 (emphasis added).

In *Cox*, the Supreme Court signaled agreement with this section of the Model

Penal Code as well, favorably referencing the Code in a footnote. 379 U.S. at 569 n.3

(citing Model Penal Code § 2.04(3)(b), Tentative Draft No. 4). The draft referenced

was the 1955 draft, which was nearly identical to the final version. *See*

Gabriel J. Chin, et al., *The Mistake of law Defense and an Unconstitutional Provision of the*

*Model Penal Code*, 93 N.C. L. REV. 139, 157 n.111 (2014) (tracing history of code).

Mr. Cox's proposed good-faith defense is consistent with both the Supreme Court

cases and the Model Penal Code.

## D. The reasonableness of relying on a statute to guide one's conduct

It makes sense for the Model Penal Code to require that an advisor who is an

individual official be the one responsible for interpreting, administering, or enforcing

the relevant law, but *not* to require this identity when the advisor is a statute. The

collective judgment of an entire state legislature, regardless of jurisdiction, is surely

more trustworthy than the advice of an extra-jurisdictional individual official.

The reasonableness of relying on local law to guide one's conduct is perhaps best

illustrated by the Fourth Amendment cases holding that an officer's good-faith

30

reliance on a legal enactment may excuse otherwise unlawful conduct. *See Michigan v. DeFillippo*, 443 U.S. 31 (1979). In *DeFillippo*, the Supreme Court held that a law-enforcement officer's good-faith reliance on a municipal ordinance that was later held unconstitutional rendered what would otherwise have been an unlawful arrest lawful under the Fourth Amendment. *Id.* at 37-40. The Court explained that "[a] prudent officer . . . should not have been required to anticipate that a court would later hold the ordinance unconstitutional." *Id.* at 37-38. The Court emphasized the reasonableness of relying on an enacted law: "The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality—with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Id.* at 38. *Cf. Heien v. North Carolina*, 135 S.Ct. 530 (2014) (officer's reasonable mistake of law did not render car stop illegal under the Fourth Amendment); *Roska ex rel. Roska v. Peterson*, 328 F.3d 1230, 1251-52 & n.29 (10th Cir. 2003) (in considering the qualified immunity of a state officer, "one relevant factor is whether the defendant relied on a state statute, regulation, or official policy that explicitly sanctioned the conduct in question"; "[w]hen a city council has duly enacted an ordinance, police officers on the street are ordinarily entitled to rely on the assumption that the council members have considered the views of legal counsel and concluded that the ordinance is a valid and constitutional exercise of authority") (citation omitted).

31

Mr. Cox should not have been required to anticipate that a court might later hold the Kansas Act invalid or preempted. His good-faith reliance on the Act was reasonable, and this Court should recognize his mistake-of-law defense.

## E. Traditional reasons that "ignorance of the law is no excuse"

As Professor LaFave has observed, the "early notion that the law is 'definite and knowable'" "is now an obvious fiction." Wayne R. LaFave, *Ignorance or mistake*, 1 SUBST. CRIM. L. § 5.6(d) (2d ed. 2016) (citations omitted). It may well be that the National Firearms Act standing alone is a (relatively) "definite and knowable" scheme, but no ordinary citizen can be expected to be so schooled in the intricacies of the Supremacy Clause, Congress's taxing powers, and the Commerce Clause as to resolve the tension between the NFA and the Kansas Second Amendment Protection Act. *See Cardiff*, 344 U.S. at 176 (conflicting statutory provisions did not give "fair warning" of what conduct was criminal).

Other reasons for the rule are likewise unpersuasive here. Difficulties of proof, for instance, are no greater here than in other areas of the criminal law. LaFave, 1 SUBST. CRIM. L. § 5.6(d) n.76-77. And any balancing of fairness to the defendant who mistook the law against "interests on the other side of the scales," *Hardridge*, 379 F.3d at 1194 (citation omitted), weighs in favor of allowing the defense here, where the defendant has not "demonstrated any degree of social dangerousness," and the

underlying conduct is "not inherently immoral," LaFave, 1 SUBST. CRIM. L. § 5.6(d) n.84-88.

## F. Not inherently immoral

To expand on this last point, the conduct criminalized by the NFA is not inherently bad (*malum in se*); it is bad only because Congress said so (*malum prohibitum*). Making, possessing, or transferring an unregistered firearm is not an act that alone imputes a guilty mind. The Supreme Court has suggested that this fact is important when considering whether to recognize a good-faith mistake-of-law defense. *See Cox*, 379 U.S. at 569 n.3, *favorably citing People v. Ferguson*, 24 P.2d 965, 970 (Cal. App. Div. 2 1933) (where "[t]he regulation that has not been complied with is malum prohibitum and not malum in se," trial court should have allowed defendant to present evidence that he relied on official advice in selling securities without a permit).

This fact was also important to the Supreme Court when it held that the National Firearms Act does not impose strict liability. *Staples v. United States*, 511 U.S. 600 (1994). In *Staples* (a machine-gun case), the Supreme Court construed the NFA to implicitly include, at the very least, "a conventional *mens rea* element, which would require that the defendant know the facts that make his conduct illegal." 511 U.S. at 605. The Court reiterated "the particular care we have taken to avoid construing a statute to dispense with *mens rea* where doing so would 'criminalize a broad range of apparently innocent conduct.'" *Id.* at 616, 610, *quoting Liparota v. United States*, 471 U.S.

33

419 (1985) (statute criminalizing food-stamp fraud requires knowledge that conduct was unauthorized). The *Staples* Court was guided by this principle of protecting "apparently innocent conduct" throughout its opinion. 511 U.S. at 614-15 ("the Government's construction of the statute potentially would impose criminal sanctions on a class of persons whose mental state—ignorance of the characteristics of weapons in their possession—makes their actions entirely innocent"); *id.* at 610 (rejecting government's suggestion that "one would hardly be surprised to learn that owning a gun is not an innocent act"); *id.* at 611 ("guns generally can be owned in perfect innocence"); *id.* at 622 ("the purpose of the mens rea requirement" is "to shield people against punishment for apparently innocent activity") (Ginsburg, J. concurring).

This Court does not need to read a more protective *mens rea* into the NFA than did *Staples* to recognize Mr. Cox's proffered defense. *Cf. PICCO*, 411 U.S. at 656 n.1 (reciting statute of conviction; no mens rea on face of statute). Rather, we simply ask this Court to take into account the fact that "guns generally can be owned in perfect innocence" when considering Mr. Cox's defense. This is not a situation where a state legislature, for instance, purported to legalize bank robbery. The generally innocent nature of the offenses in question rendered Mr. Cox's reliance on the Kansas Act reasonable, and weighs in favor of recognizing his defense.

34

## G. The NFA's harsh penalties

Another factor important to the *Staples* Court, and weighing in favor of recognizing Mr. Cox's defense, is the NFA's "severe penalty" of up to ten years in prison. *Staples*, 511 U.S. at 618; *see also id.* at 615 (agreeing it was "unthinkable to us that Congress intended to subject . . . law-abiding, well-intentioned citizens to a possible ten-year term of imprisonment" if they were truly ignorant of a weapon's characteristics) (citation omitted); *id.* at 616 ("The potentially harsh penalty attached to [a] violation of § 5861(d)—up to 10 years' imprisonment—confirms our reading of the Act."). The NFA continues to prescribe a penalty of up to ten years' imprisonment. 26 U.S.C. § 5871. The Sentencing Guidelines are likewise harsh. Absent the district court's downward variance to probation, Mr. Cox was looking at a guideline sentence of 78 to 97 months' imprisonment (about six-and-a-half to eight years). R2.84 at 21; R2.89 at 1. With these penalties in play, it becomes even more important to guard against convicting a defendant for acts committed in good-faith reliance on a seemingly authoritative state statute.

## H. Conclusion

"Ordinarily, citizens may not be punished for actions undertaken in good faith reliance upon authoritative assurance that punishment will not attach." *United States v. Laub*, 385 U.S. 475, 487 (1967) (citing *Raley*). In passing the Second Amendment Protection Act, the Kansas legislature authoritatively assured all Kansans, including

Mr. Cox, that federal requirements did not apply to the purely local making, possession, and transfer of firearms. Mr. Cox in good faith relied on the Kansas Act when he engaged in the conduct for which he now stands convicted. Under these circumstances, "traditional notions of fairness inherent in our system of criminal justice prevent the Government from proceeding." *PICCO*, 411 U.S. at 674. The district court violated Mr. Cox's due-process rights when it refused to allow evidence and instructions in support of his theory of defense, and when it gave instructions directly contrary to his theory of defense. The district court's rulings and instructions completely gutted Mr. Cox's case, and his convictions must now be reversed.

## 2. The National Firearms Act as applied to silencers and short-barreled rifles violates the Second Amendment.

### Issue raised and ruled on

Mr. Cox moved to dismiss this prosecution on Second Amendment grounds. R1.78. The district court denied the motion after concluding that both short-barreled rifles and silencers fall outside the scope of the Second Amendment. R1.85 at 7-11.[16]

### Standard of review

This Court reviews constitutional challenges to a statute de novo. *United States v. Reese*, 627 F.3d 792, 799 (10th Cir. 2010).

---

[16] This order is published at *United States v. Cox*, ___ F.3d ___, 2017 WL 411358 (D. Kan. 2017).

36

**Legal background**

The Second Amendment to the Constitution protects "the right of the people to keep and bear arms." U.S. Const. Amend. II. In *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008), the Supreme Court held that this provision "confer[s] an individual right to keep and bear arms," and that an outright ban on possessing useable handguns in the home violated the Second Amendment.

This Court has read *Heller* as suggesting "a two-pronged approach to Second Amendment challenges to federal statutes." *Reese*, 627 F.3d at 800. At the first step, a reviewing court asks "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee." *Id.* If so, the court moves to step two, where it "must evaluate the law under some form of means-end scrutiny." *Id.* Something more than the rational basis test must apply. *Id.* at 801.

In *Reese*, this Court adopted an intermediate-scrutiny test to determine whether the ban on possessing firearms while subject to a domestic-protection order (18 U.S.C. § 922(g)(8)) violated the Second Amendment. *Id.* at 802. Specifically, this Court taxed the government with the burden of demonstrating that the ban had an "important" objective, and that this objective was "advanced by means substantially related to that objective." *Id.*; *accord Bonidy v. U.S. Postal Service*, 790 F.3d 1121, 1126 (10th Cir. 2015) (applying intermediate scrutiny to uphold regulation prohibiting storage of firearms in car on USPS parking lot). The D.C. Circuit used a similar intermediate-scrutiny test to

consider the constitutionality of a firearms registration scheme that was passed by the

D.C. City Council in the wake of *Heller. Heller v. District of Columbia*, 801 F.3d 264, 272

(D.C. Cir. 2015) (*Heller II*) (obligating the District to show that, first, the challenged

provision "promotes a substantial governmental interest that would be achieved less

effectively absent the regulation, and second, that the means chosen are not

substantially broader than necessary to achieve that interest") (internal marks and

citations omitted). Strict scrutiny, however, may be the appropriate level of scrutiny

for some Second Amendment claims, especially those related to the right of law-

abiding citizens to possess protected firearms in the home. *See, e.g.*, *United States v.*

*Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011) ("we assume that any law that would

burden the 'fundamental,' core right of self-defense in the home by a law-abiding

citizen would be subject to strict scrutiny").

**Discussion**

Both Mr. Kettler and the State of Kansas have argued that the National Firearms

Act violates (or at least implicates) the Second Amendment when it comes to the

possession of silencers. *United States v. Kettler*, companioned Case No. 17-3035,

Appellant's Op. Br. at 26-36 (filed July 21, 2017); *United States v. Kettler*, companioned

Case No. 17-3035, Br. of Intervenor State of Kansas at 15-25 (filed July 21, 2017). Mr.

Kettler and Kansas appear to take different analytical approaches to this issue. Mr.

Kettler argues that the taxes imposed by the National Firearms Act violate the Second

Amendment because (1) the possession of silencers is protected by the Second

Amendment, Kettler Op. Br. at 32-36; and (2) no general revenue-generating tax may

be charged for the enjoyment of a constitutional right, *id.* at 27-32. Mr. Kettler does

not address this Court's two-pronged post-*Heller* approach to Second Amendment

challenges.

Kansas's argument, in contrast, does not focus on the tax aspect of the NFA and

appears at least consistent with this Court's two-pronged post-*Heller* approach. Kansas

argues that (1) the possession of silencers is protected by the Second Amendment,

Kansas Br. at 15-24; and (2) a remand is necessary so that the district court may

determine "whether the National Firearms Act, as applied, is a permissible limitation

on the right to keep and bear arms under the Second Amendment," *Id.* at 25.

We adopt by reference both arguments here. Fed. R. App. P. 28(i). Because Mr.

Cox was convicted of making, transferring, and dealing in silencers, and of possessing

a short-barreled rifle, his case raises two additional questions: whether the Second

Amendment protects the making and selling of silencers (Counts 6-12); and whether

the Second Amendment protects the possession of short-barreled rifles (Count 3). We

will address each of these issues below under prong one of this Court's Second

Amendment approach, and then turn to the prong-two question of a remand.

## A. Prong One: Whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee

By imposing tax and registration and authorization requirements[17] on the making, possession, and transfer of silencers and short-barreled rifles, the National Firearms Act undoubtedly imposes a burden on that conduct.[18] Indeed, Mr. Cox felt sufficiently burdened by these requirements that he chose not to make or market any NFA-covered firearms until he believed he could legally do so without all "the red tape, the money involved." R3.109 at 123. The harder question is whether that conduct falls within the scope of the Second Amendment's guarantee. For the reasons that follow, it does.

### (1) Making and selling protected firearms falls within the Second Amendment

It does not appear that this Court has, since *Heller*, considered whether the Second Amendment protects the making and selling of firearms.[19] The Third, Seventh, and

---

[17] Manufacturers and dealers must: register yearly; pay a yearly tax; pay a tax on each firearm made; obtain authorization before making each firearm; register each firearm made; and submit a photograph and fingerprints. 26 U.S.C. §§ 5801, 5802, 5821, 5841. Transferors of firearms must: obtain approval before each firearm transfer; pay a tax on each firearm transfer; and submit the transferee's photograph and fingerprints. 26 U.S.C. §§ 5811 5812, 5841.

[18] Whether this burden is excessive is a question reserved for the scrutiny applied at prong two.

[19] In *United States v. Graham*, 305 F.3d 1094 (10th Cir. 2002)—a pre-*Heller* case—this Court rejected a Second Amendment challenge to 18 U.S.C. § 842(a)(1) (dealing in explosive materials without a license).

40

Ninth Circuits have all suggested post-*Heller* that sellers may assert Second Amendment rights—either their own, or those of their customers. *See Teixeira v. County of Alameda*, 822 F.3d 1047 (9th Cir. 2016) ("the right to purchase and to sell firearms is part and parcel of the historically recognized right to keep and to bear arms");[20] *Ezell v. City of Chicago*, 651 F.3d 684, 696 (7th Cir. 2011) ("Action Target, as a supplier of firing-range facilities, is harmed by the firing-range ban and is also permitted to 'act[ ] as [an] advocate[ ] of the rights of third parties who seek access to' its services.") (citations omitted); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010) (noting in dicta that "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment," and that a prohibition on the commercial sale of firearms "would be untenable under *Heller*"); *accord Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 931 n.3 (N.D. Ill. 2014) (organization of firearms retailers had "associational standing" to pursue Second Amendment claim).

A panel of the Fourth Circuit, on the other hand, rejected the idea in an unpublished per curiam opinion in *United States v. Chafin*, 423 Fed. Appx. 342 (4th Cir.

---

[20] The Ninth Circuit ordered this case reheard en banc in *Teixeira v. County of Alameda*, 854 F.3d 1046 (9th Cir. 2016). After receiving supplemental briefs from the parties and multiple amicus briefs, the Ninth Circuit held argument en banc on March 22, 2017. It has not, as of this writing, issued a decision. We rely on the panel decision here for its persuasive value.

2011) (unpublished). In *Chafin*, the Fourth Circuit refused to credit a gun-seller's Second Amendment challenge to 18 U.S.C. 922(d)(3), holding that selling a firearm *to an unlawful drug user* did not fall within the Second Amendment. *Id.* The court noted the defendant's failure to point to any authority that, "at the time of its ratification, the Second Amendment was understood to protect an individual's right to *sell* a firearm. Indeed, although the Second Amendment protects an individual's right to bear arms, it does not necessarily give rise to a corresponding right to sell a firearm." *Id.* at 344 (emphasis in original).

The Third, Seventh, and Ninth Circuits have the better (and better litigated) position in light of *Heller*, history, and Supreme Court jurisprudence in other constitutional contexts. In *Heller*, the Supreme Court identified "laws imposing conditions and qualifications on the commercial sale of arms" as "*presumptively* lawful regulatory measures." 554 U.S. at 626-27 & n.26 (emphasis added). Where a presumption lies, it may be rebutted; thus nothing in *Heller* excludes firearms makers and sellers from Second Amendment protection. Rather, *Heller's* recognition of the Second Amendment as an individual right counsels the opposite: "If 'the right of the people to keep and bear arms' is to have any force, the people must have a right to acquire the very firearms they are entitled to keep and to bear. Indeed, where a right depends on subsidiary activity, it would make little sense if the right did not extend, at least partly, to such activity as well." *Teixeira*, 822 F.3d at 1055.

Historically speaking, there is good reason to believe that the Second Amendment was understood at its adoption to protect firearms makers and sellers. As the Ninth Circuit observed in *Teixeira*, Thomas Jefferson wrote in 1793 that "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." *Teixeira*, 822 F.3d at 1055 (quoting Thomas Jefferson, 3 WRITINGS 558 (H.A. Washington ed. 1853)).[21] This statement is consistent with other historical evidence that, "[i]n terms of the original meaning of the Second Amendment, the right to engage in firearms commerce is clear." David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 HARV. L. REV. F. 230, 234-35 (2014).

Lastly, support for extending the Second Amendment to firearms makers and sellers may be found in other constitutional contexts. *See, e.g., Craig v. Boren*, 429 U.S. 190 (1976) (beer vendor could raise equal protection challenge to state law prohibiting beer sales to males under age 21); *Eisenstadt v. Baird*, 405 U.S. 438 (1972) (defendant convicted of distributing contraceptive foam could assert, in his own defense, rights of persons unconstitutionally denied access to contraceptives). In *Baird*, the Supreme

---

[21] Jefferson's full letter, rejecting a ban on arms production in the States proposed by British diplomat George Hammond, may be read online at the National Archives here: https://founders.archives.gov/documents/Jefferson/01-26-02-0031. Archive notes indicate that the letter was approved by both Cabinet members and President Washington.

Court permitted Defendant Baird—a birth-control advocate who had given away contraceptives at a college event—to challenge the statute under which he was convicted on equal-protection grounds. The statute criminalized the distribution of contraceptives to unmarried persons. Since enforcement of the statute would "materially impair the ability of single persons to obtain contraceptives," the Supreme Court held that Baird had standing "to assert the rights of unmarried persons denied access to contraceptives" as a defense to his criminal conviction. 405 U.S. at 445-46. The Court went on to hold that the statute violated the rights of single people under the Equal Protection Clause. *Id.* at 453-55. Mr. Baird's conviction under the statute could therefore not be sustained. *Id.*

The same holds true in the Second Amendment context. The enforcement of burdens on the making and selling of protected firearms necessarily limits the ability of people to exercise their Second Amendment right to obtain and possess those firearms.[22] In other words, if possessing silencers implicates the Second Amendment (as we argue below), then, by extension, so does the making and transfer of silencers, and Mr. Cox may challenge his convictions on Counts 6-12 on Second Amendment grounds.

---

[22] Again, whether the government can defend those burdens is a question reserved for prong two of this Court's Second Amendment jurisprudence. *See Reese*, 627 F.3d at 802.

44

**(2) Possession of silencers falls within the Second Amendment**

As Mr. Kettler and the State of Kansas have argued, silencers are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. We will not repeat their arguments, but add that Kansas's emphasis on the lawful health and safety purposes of silencers is echoed in legislation currently pending in Congress to remove silencers from NFA coverage. Representative Jeff Duncan introduced the Hearing Protection Act of 2017 with the following constitutional authority statement: "With this Resolution, Congress is defending the 2nd Amendment prerogative to keep and bear arms. The legislation protects the hearing of those who choose to pursue their rights under the 2nd Amendment without undue government burden."[23]

The hearing-protection benefits of silencers extends beyond mere hunting and sport-shooting. As some silencer advocates have pointed out, silencers improve accuracy by reducing muzzle flinch and the disorientation that can follow a loud shot. *See* A.J. Peterman, *Second Amendment Decision Rules, Non-Lethal Weapons, and Self-Defense*, 97 MARQ. L. REV. 853, 892 n.221 (2014) (quoting firearms instructor's warning: "[I]f you fire that shotgun it's going to be extremely loud, and you will probably lose your hearing for a few minutes. Those few minutes can be vital, because the intruder now

---

[23] Act and statement available at https://www.congress.gov/bill/115th-congress/house-bill/367.

45

knows where you are and you're unable to be as alert as you normally would.");
Stephen P. Halbrook, *Firearm Sound Moderators: Issues of Criminalization and the Second
Amendment*, 46 CUMB. L. REV. 33, 69 (2015-2016) ("Legitimate advantages could also
be listed for a suppressor, whether used for sporting purposes or for self-defense—
reduction of noise, recoil, and muzzle rise immediately come to mind."). Silencers are
thus valuable for home-defense—the "core lawful purpose" of firearms ownership
recognized by *Heller*. 554 U.S. at 629-30. The person who reaches for a firearm to
protect against an intruder (animal or human) does not want to pause and don
earmuffs or earplugs to prevent the health and safety fallout of unsuppressed gunfire,
and certainly does not want to muffle the sounds of the surrounding environment in
order to protect his or her hearing.

   And while silencers aid home defense, they do *not* aid crime as much as do other
firearms not subject to the NFA. According to one news source, "[d]ata from the
ATF show that silencers are seldom used in crime. From 2012-15, 390 silencers were
recovered from crime scenes where an ATF trace was requested. During that same
period, more than 600,000 pistols were recovered." Nathan Rott, *Debate Over Silencers:
Hearing Protection or Public Safety Threat?*, ALL THINGS CONSIDERED (NPR Mar. 21,

2017).[24] Another study of silencer-related prosecutions reported in Westlaw and Lexis from 1995 to 2005 found only 153 cases "in which the evidence suggests a silencer was used for a criminal purpose." Paul A. Clark, *Criminal Use of Firearm Silencers*, 8 WESTERN CRIMINOLOGY REV. 44, 49-51 (2007).[25] More than 80% of those cases involved non-violent victimless crimes. *Id.* Only two reported federal cases in the 10-year study involved a silencer used in a murder. *Id.* at 52. In contrast, "ordinary firearms are far more likely to be actively employed, as well as used to injure a victim." *Id.*

All of this evidence points to but one conclusion: Silencers are typically possessed by law-abiding citizens for lawful purposes, and this Court should deem their possession, making, and transfer protected by the Second Amendment.

**(3) Possession of short-barreled rifles falls within the Second Amendment**

Like silencers, short-barreled rifles are also typically possessed by law-abiding citizens. ATF statistics reflect 213,594 short-barreled rifles and 140,474 short-barreled shotguns registered in the United States as of February 2016. FIREARMS COMMERCE

---

[24] Available at http://www.npr.org/2017/03/21/520953793/debate-over-silencers-hearing-protection-or-public-safety-threat.

[25] Available at http://www.westerncriminology.org/documents/WCR/v08n2/clark.pdf.

IN THE UNITED STATES 2016 at 15 (US DOJ BATFE 2016).[26] Legal uses of short-barreled firearms include collecting, hunting, and home defense. *See, e.g.*, *United States v. Buffalo*, 10 F.3d 575, 576 (8th Cir. 1993) (defendant used short-barreled rifle to "shoot skunks, weasels, and raccoons that killed his chickens"); *United States v. Hammond*, 1991 WL 103450 at *1 (9th Cir. 1991) (unpublished) (defendant purchased short-barreled shotgun "for hunting and had used it to kill a number of grouse for eating").

Short-barreled firearms "have no discernable operational differences from firearms excluded from the [NFA]." James A. D'Cruz, *Half-Cocked: The Regulatory Framework of Short-Barrel Firearms*, 40 Harv. J.L. & Pub. Pol'y 493, 496 (2017). And they are no more dangerous than they are unusual. *Id.* at 508-09; *see also Johnson v. United States*, 135 S.Ct. 2551, 2565 (2015) ("Reported convictions support the conclusion that mere possession of a short-barreled shotgun does not, in the ordinary case, pose a serious risk of injury to others.") (Thomas, J., concurring). In 2013, for instance, out of 8,454 firearms-related homicides committed in 2013, only 285 "were committed with rifles of any type, including short-barrel rifles." *Half-Cocked*, 40 Harv. J.L. & Pub. Pol'y at

---

[26] Available at https://www.atf.gov/resource-center/docs/2016-firearms-commerce-united-states/download.

512 & n.108. And as noted above, "non-restricted pistols are far more commonly used in firearm-related crime." *Id.* at 518 & n.161.

In *United States v. Artez*, 290 Fed. Appx. 203, 208 (10th Cir. 2008) (unpublished), a panel of this Court refused to hear the defendant's Second Amendment challenge to the NFA's regulation of short-barreled shotguns because he did not preserve the issue in his conditional plea agreement. The panel added in dicta: "Regardless, the Supreme Court in *Heller* explicitly stated that 'the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.'" *Id.* But *Heller* was merely reporting what the Supreme Court had held nearly eight decades ago in *United States v. Miller*, 307 U.S. 174 (1939). *Heller*, 554 U.S. at 625 (reading *Miller* as according "with the historical understanding of the scope of the right"). Whether short-barreled rifles were typically possessed by law-abiding citizens for lawful purposes in 1939 does not inform the question today. Hundreds of thousands of people own short-barreled firearms today, and these weapons are far less associated with violent crime than other firearms. In light of these modern realities, this Court should find the possession of short-barreled rifles protected by the Second Amendment.

**B. Prong Two: Whether the NFA survives the appropriate level of scrutiny**[27]

The government has the burden "of demonstrating that its objective is an important one and that its objective is advanced by means substantially related to that objective." *Reese*, 627 F.3d at 802. The government made no effort in the district court to satisfy this burden. Instead, it argued simply that *Heller* "clearly does not countenance the possession of these weapons." R1.81 at 25-26 n.8. In other words, the government insisted that the Second Amendment doesn't protect silencers or short-barreled rifles (prong one), and never bothered arguing prong two. The district court followed suit. Concluding that neither silencers nor short-barreled rifles nor firearms commerce fall within the scope of the Second Amendment at prong one, the district court never addressed whether the NFA could pass any kind of scrutiny under prong two. R1.85 at 7-11.

This raises the question what this Court should do at this juncture if this Court finds that prong one is satisfied. There appear to be two options. First, this Court might simply find that the government has failed to satisfy its burden at prong two. Support for this result may be found in *Doe v. Albuquerque*, 667 F.3d 1111 (10th Cir. 2012). In *Doe*, this Court affirmed summary judgment in favor of a registered sex

---

[27] As argued below, R1.78 at 8-9, we submit that the proper standard is strict scrutiny. However, we do not believe that the NFA as applied here can survive even intermediate scrutiny.

50

offender who challenged the constitutionality of a city ordinance that prohibited registered offenders from entering public libraries. *Id.* at 1115. As here, the legal question was two-pronged: whether the ban implicated the First Amendment, and, if so, whether it could survive the applicable level of scrutiny. The city had argued in the district court that the ban did not implicate the First Amendment. *Id.* at 1117-21. Resting on this first-prong argument, the city did not address the second, scrutiny prong. *Id.* at 1122. On appeal, this Court declined to engage in the "speculation upon speculation" required to address the second prong. *Id.* at 1134. Instead, this Court found that the city's failure to bear its burden on the scrutiny prong "doom[ed] its ban as a matter of law." *Id.* at 1131. The same holds true here. The government's failure to make any effort to bear its burden on prong two in the district court dooms its defense of the NFA in this appeal.

In the alternative, this Court might remand the matter, as suggested by the State of Kansas, for further proceedings with respect to prong two. "Where an issue has been raised, but not ruled on, proper judicial administration generally favors remand for the district court to examine the issue initially." *Pacific Frontier v. Pleasant Grove City*, 414 F.3d 1221, 1238 (10th Cir. 2005) (remanding for consideration of constitutional claim raised but not ruled on by the district court); *accord Tennyson v. Carpenter*, 558 Fed. Appx. 813, 823 (10th Cir. 2014) (unpublished) (remanding constitutional claims so that, among other things, district court could conduct proper scrutiny review).

51

## C. Conclusion

The National Firearms Act imposes a burden on conduct related to silencers and short-barreled rifles that falls within the scope of the Second Amendment's guarantee. The government has not met its burden of proving that these burdens pass constitutional muster. This Court should therefore invalidate the NFA in this appeal, or remand this case for further proceedings.

### 3. The National Firearms Act is not a valid exercise of Congressional power— at least not as applied to silencers and short-barreled rifles that are made, possessed, and transferred within the State of Kansas.

**Issue raised and ruled on**

Mr. Cox moved to dismiss the indictment on grounds that the National Firearms Act "is an unconstitutional exercise of Congress' power to tax," and "is not valid under the Commerce Clause." R1.29. The district court denied the motion. R1.34, R1.85 at 4-7.

**Standard of review**

This Court reviews constitutional challenges to a statute de novo. *United States v. Reese*, 627 F.3d 792 (10th Cir. 2010).

**Discussion**

Mr. Kettler has argued on appeal that the National Firearms Act is not today a valid exercise of Congress's taxing power. *United States v. Kettler*, companioned Case

No. 17-3035, Appellant's Op. Br. at 9-26 (filed July 21, 2017). We adopt by reference

that argument here, Fed. R. App. P. 28(i), and add the following:

As Mr. Kettler points out, the NFA has over time become far more of a gun-*control*

measure than a gun-*tax* measure. This change is evident in, among other

developments, (1) the transfer of NFA administration and enforcement

responsibilities from the Treasury Department to the Justice Department, Kettler Op.

Br. at 12-15, (2) the fact that the taxes imposed do not, apparently, generate

meaningful revenue, Kettler Op. Br. at 20-24, and (3) the NFA's harsh criminal

penalties. The Supreme Court's decision in the Affordable Care Act case supports the

proposition that these features place the NFA beyond Congress's taxing power. *See*

*Natl. Fedn. of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) (*NFIB*).

In *NFIB*, the Supreme Court upheld the Affordable Care Act as a proper exercise

of Congress's taxing power. At least three prominent features of the Act supported

this conclusion: the fact that the challenged "shared responsibility payment" was

assessed and collected by the IRS "in the same manner as taxes"; the fact that the

payment was expected to raise "about $4 billion per year by 2017"; and the fact that

"[n]either the Act nor any other law attaches negative legal consequences to not

buying health insurance, beyond requiring a payment to the IRS." *Id.* at 563-64, 567-

68. These three features—Treasury control, "at least some revenue," and no

penalty—are notably absent from today's NFA. As Kettler points out, the NFA more

53

closely resembles the Child Labor Tax law struck down in *Bailey v. Drexel Furniture Co.*, 259 U.S. 20 (1922) (Child Labor Tax Case)—a case which the *NFIB* took care to distinguish in analyzing the Affordable Care Act. 567 U.S. at 565-66.

Neither can the NFA be upheld as a valid exercise of Congress's Commerce Clause power, at least not as applied to the local making, possession, and transfer of silencers and short-barreled rifles.[28] The State of Kansas has argued that "[a] personal firearm or firearm accessory that is manufactured and owned in Kansas, that remains within the borders of Kansas . . . does not fall within Congress's authority to regulate the channels of interstate commerce, the instrumentalities of interstate commerce, or activities that substantially affect interstate commerce." *United States v. Kettler*, companioned Case No. 17-3035, Br. of Intervenor State of Kansas at 12-14 (filed July 21, 2017). We adopt by reference that argument here. Fed. R. App. P. 28(i).

## Conclusion

In sum, this Court should invalidate the National Firearms Act as applied to silencers and short-barreled rifles because it exceeds Congressional authority and violates the Second Amendment. In the alternative, this Court should reverse Mr.

---

[28] The district court, having found that "the NFA is a valid exercise of Congress's taxing power," determined that it was unnecessary to rule on this issue. R1.85 at 12.

54

Cox's conviction on due-process grounds, and remand for further proceedings on the Second Amendment question and, if necessary, a new trial.

## Oral Argument Statement

Oral argument is requested. This appeal raises complex constitutional questions of first impression, the resolution of which will be aided by oral argument.

Respectfully submitted,

By: s/ Melody Brannon
MELODY BRANNON
Kansas Federal Public Defender

By: s/ Paige A. Nichols
PAIGE A. NICHOLS
Assistant Federal Public Defender
Kansas Federal Public Defender
117 SW 6th Avenue, Suite 200
Topeka, Kansas 66603-3840
Tel: (785) 232-9828
Fax: (785) 232-9886
Email: paige_nichols@fd.org

Attorneys for Defendant-Appellant
SHANE COX

**Certificate of Compliance with Fed. R. App. P. 32(a)**

I certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(5) & (7)(B) in that it contains 12,930 words in a proportionally spaced typeface (14-point Garamond; as allowed by 10th Circuit Rule 32(a)), as shown by Microsoft Word 2013, which was used to prepare this brief.

<u>s/ Paige A. Nichols</u>
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: August 21, 2017

**Certificate of Compliance with 10th Circuit Rule 25.5**

I certify that this brief complies with the applicable privacy and redaction requirements of 10th Circuit Rule 25.5 and the rules cited therein.

<u>s/ Paige A. Nichols</u>
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: August 21, 2017

**Certificate of Compliance with the Policies and Procedures
or Electronic Filing via ECF**

I certify that the hard copies of this brief submitted to the Court are exact copies of the version submitted electronically, and that the electronic submission was scanned for viruses with the most recent version of Symantec Endpoint Protection (Live Update on August 21, 2017), and is free of viruses.

<u>s/ Paige A. Nichols</u>
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: August 21, 2017

## Certificate of Service

I certify that on 08/21/2017, this brief was filed with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. Because opposing counsel (Assistant United States Attorney Jared Maag) is a registered CM/ECF user, s/he will also be served by the CM/ECF system. 10th Cir. R. 31.5.

Seven hard copies will be mailed to the Clerk of the Court per 10th Cir. R. 31.5 at:

Tenth Circuit Court of Appeals
1823 Stout Street
Denver, Colorado 80257

<u>s/ Paige A. Nichols</u>
PAIGE A. NICHOLS
Assistant Federal Public Defender

Dated: August 21, 2017

Attachment:
# Memorandum and Order, R1.34

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                              6:15-cr-10150-JTM-01,02

SHANE COX, and
JEREMY KETTLER,

        Defendants.

**MEMORANDUM AND ORDER**

    This matter is before the court on a motion to dismiss the indictment by defendant Shane Cox (Dkt. 29), and a motion to dismiss counts 5 and 13 by defendant Jeremy Kettler (Dkt. 32). For the reasons set forth herein, the court finds that the motions should be denied.

**I. Summary**

    A first superseding indictment filed March 9, 2016, contains thirteen counts. Dkt. 27. Shane Cox, who is named in all but two counts, is charged with three counts of unlawful possession of an unregistered firearm (26 U.S.C. § 5861(d)), one count of conspiracy (18 U.S.C. § 371), five counts of unlawful transfer of an unregistered firearm (26 U.S.C. § 5861(e)), one count of unlawfully making a firearm in violation of the National Firearms Act (26 U.S.C. § 5861(f)), and one count of unlawfully engaging in business as a dealer and manufacturer of firearms (26 U.S.C. § 5861(a)). Jeremy Kettler is charged in three counts: one count each of making false statements on a matter within

the jurisdiction of the executive branch of the U.S. Government (18 U.S.C. § 1001), conspiracy (18 U.S.C. § 371), and unlawful possession of an unregistered firearm (26 U.S.C. § 5861(d)).

The "firearms" identified in the foregoing counts include silencers, destructive devices, and a short-barreled rifle. *See* 26 U.S.C. § 5845(a) (defining "firearm" under the National Firearms Act (NFA) to include the foregoing devices). The NFA generally requires individuals who make or transfer these types of firearms to register them and to pay a special tax. *See Johnson v. United States*, 135 S.Ct. 2551 (2015). Section 5861 of the Act makes it unlawful to possess, make, receive, or transfer a firearm covered by the Act without having registered or paid the tax required by the Act.

In his motion to dismiss, defendant Cox argues that 26 U.S.C. § 5861 is unconstitutional because it is an invalid exercise of Congress' power to tax: "Congress has used the power to tax as a subterfuge to regulate the possession of certain weapons, and to punish severely the possession of those weapons not brought within the federal regulation scheme, thus the statute is unconstitutional." Dkt. 29 at 5. Defendant claims that "[o]n its face, and as applied, the statute … is much more than a taxing measure," because the NFA "gives the government the discretion to decide who can register a firearm, prohibits the registration of weapons the government determines may not be legally made, transferred, or possessed, and then criminally punishes the failure to register the weapon." *Id*. at 11. Defendant claims this is unconstitutional "because it goes beyond the power to tax." *Id*.

2

Cox additionally argues that 26 U.S.C. § 5861(d) is not valid under Congress' power to regulate interstate commerce. Dkt. 29 at 13. Defendant argues that criminalizing the intrastate possession of a firearm does not implicate any of the three areas of interstate commerce that Congress may properly regulate – i.e., the channels of interstate commerce; the instrumentalities of interstate commerce (including persons and things in interstate commerce); and activities that substantially affect interstate commerce. *Id*. at 15-18 (*citing, inter alia, United States v. Lopez*, 514 U.S. 549 (1995) (prohibition on possession of a firearm in a school zone exceeded Congress' authority to regulate interstate commerce)).[1]

Defendant Jeremy Kettler moves to dismiss Counts 5 and 13 on grounds of entrapment by estoppel. Kettler contends that he relied in good faith on the Kansas Second Amendment Protection Act, which declares in part that any firearm or "firearm accessory," including a silencer, which is made in Kansas and which remains in Kansas, "is not subject to any federal law … under the authority of congress to regulate interstate commerce." *See* K.S.A. § 50-1204. Kettler argues that 26 U.S.C. § 5861 "require[s] knowledge that someone is possessing a 'firearm' in violation of the federal prohibition in order to be found guilty," and that he "could not have known that any attribute of the 'firearm' brought it within federal regulation because the Kansas

---

[1] Cox opened and closed his brief with assertions that he did not intend to violate the law. *See* Dkt. 29 at 2 ("Cox relied on his State of Kansas representatives and did not believe he was violating the law") and at 25 ("defendant had reason to believe in and rely on the law of Kansas"). These assertions about Cox's subjective intent are not otherwise argued in the briefs. To the extent Cox is arguing that he did not have the intent necessary to commit the offense, that is a question for the jury to decide based upon the evidence and the instructions given at trial. To the extent Cox is raising a defense of entrapment by estoppel, that argument is rejected for the same reasons set forth herein pertaining to defendant Kettler.

3

legislature … explicitly told the citizens of the State of Kansas that a sound suppressor did not fall within federal regulation." <u>Dkt. 32 at 4</u>.  Kettler argues that this amounts to a defense of entrapment by estoppel, which can arise from a person's reasonable reliance upon the misleading representations of a government agent. *Id.* at 4 (*citing United States v. Hardridge*, <u>379 F.3d 1188</u> (10th Cir. 2004)).

## II. Discussion

A. <u>Whether 26 U.S.C. § 5861 is a valid exercise of Congress' taxing authority</u>.  The National Firearms Act imposes strict regulatory requirements on certain statutorily defined "firearms." *Staples v. United States*, <u>511 U.S. 600, 602</u> (1994). Under the Act, the term "firearm" includes, among other things, a rifle having a barrel of less than 16 inches in length, a silencer, and a destructive device. <u>26 U.S.C. § 5845(a)</u>. Under the Act, all such firearms must be registered in the National Firearms Registration and Transfer Record maintained by the Secretary of the Treasury. § 5841. Section 5861(d) makes it a federal crime, punishable by up to 10 years in prison, for any person to possess a firearm that is not properly registered. *Staples*, <u>511 U.S. at 602-03</u>.

Among other things, the Act imposes a tax upon dealers in these firearms (§ 5801); requires registration of dealers (§ 5802); imposes a tax of $200 per firearm on the maker of the firearm (§ 5821); imposes a $200 tax on each firearm transferred, with the tax to be paid by the transferor (§ 5811); and prohibits transfers unless a number of conditions are met, including that the transferor must file an application with the Secretary, the transferor must pay the required tax and identify the transferee and the firearm, and the Secretary must approve the transfer (§ 5812).

4

As Cox concedes, the Supreme Court long ago rejected the argument that the Act was not a valid exercise of Congress' authority to levy taxes because it was allegedly designed as a penalty to suppress trafficking in certain firearms. *See Sonzinsky v. United States*, 300 U.S. 506, 512-14 (1937) ("a tax is not any the less a tax because it has a regulatory effect"). Since then, the Tenth Circuit, like all other circuits to address the issue, has found that § 5861 represents a valid exercise of Congress' taxing authority. *See United States v. Houston*, 103 F. Appx. 346, 349-50, 2004 WL 1465776 (10th Cir. 2004) ("Mr. Houston fails to establish 26 U.S.C. § 5861(d) and its parent act are beyond Congress' enumerated power to either regulate commerce through firearms registration requirements, or impose a tax thereon."); *United States v. Roots*, 124 F.3d 218 (Table), 1997 WL 465199 (10th Cir. 1997) ("*Lopez* does not undermine the constitutionality of § 5861(d) because that provision was promulgated pursuant to Congress's power to tax"). *See also United States v. Village Center*, 452 F.3d 949, 950 (8th Cir. 2006) ("irrespective of whether § 5861(c) is a valid exercise of Congress's commerce clause authority … it is a valid exercise of Congress's taxing authority"); *United States v. Lim*, 444 F.3d 910, 914 (7th Cir. 2006) ("Section 5861(d), as applied to Lim's possession of the sawed-off shotgun, is a valid use of Congress's taxing power"); *United States v. Pellicano*, 135 F. Appx. 44, 2005 WL 1368077 (9th Cir. 2005) (valid exercise of taxing power); *United States v. Oliver*, 208 F.2d 211 Table), 2000 WL 263954 (4th Cir. 2000) (the weapon need not have traveled in interstate commerce because § 5861 "has been held to be a valid exercise of the power of Congress to tax"); *United States v. Gresham*, 118 F.3d 258, 261-62 (5th Cir. 1997) ("Gresham charges that Congress has used the taxing power as a pretext

5

to prohibit the possession of certain disfavored weapons, without any rational relationship to the revenue-raising purposes of the Internal Revenue Code. … To the contrary, it is well-settled that § 5861(d) is constitutional because it is 'part of the web of regulation aiding enforcement of the transfer tax provision in § 5811.'"); *United States v. Dodge*, 61 F.3d 142, 145 (2nd Cir. 1995) (the registration requirement "bears a sufficient nexus to the overall taxing scheme of the NFA and, therefore, assists the government in collecting revenues.").

Defendant tries to get around these cases by relying on *United States v. Dalton*, 960 F.2d 121 (10th Cir. 1992). In that case the Tenth Circuit held it was unconstitutional to convict a defendant for possessing an unregistered machine gun when there was a separate criminal ban on possession of machine guns. The ban made registration of such weapons a legal impossibility. In that circumstance, the Tenth Circuit found, the § 5861 could not reasonably be viewed as an aid to the collection of tax revenue. *See Dalton*, 960 F.2d at 125 ("a provision which is passed as an exercise of the taxing power no longer has that constitutional basis when Congress decrees that the subject of that provision can no longer be taxed."). But the Tenth Circuit soon made clear that *Dalton* applied only if there was a statutory ban on possession of the particular firearm. Thus, § 5861 was constitutionally applied to possession of a sawed-off shotgun, a weapon as to which there was no separate ban. *United States v. McCollom*, 12 F.3d 968 (10th Cir. 1993). *See also United States v. Berres*, 777 F.3d 1083 (10th Cir. 2015) (rejecting due process challenge to conviction for possession of unregistered flash-bang device). The *McCollom* rule applies equally to the firearms identified in the indictment in this case – silencers,

short-barreled rifles, and destructive devices – because it was legally possible to register and pay the required tax on such items. *Berres*, 777 F.3d at 1088; *McCollom*, 12 F.3d at 971 ("[d]ifferent from *Dalton*, the registration of this weapon was not a legal impossibility."); *United States v. Eaton*, 260 F.3d 1232, 1236 (10th Cir. 2001) (defendant's conviction for possessing unregistered pipe bombs did not violate due process; there was no statute criminalizing possession of pipe bombs and defendant was not precluded by law from registering them).

Finally, Cox contends that because the government retains some authority to deny an application for registration of a firearm, that fact somehow renders the Act unconstitutional. Dkt. 29 at 8-9. As an initial matter, the court notes defendant has not alleged that an application for registration of these particular firearms was in fact denied. Moreover, the Tenth Circuit has made clear that it is only when registration is a legal impossibility that application of § 5861 constitutes a due process violation. *See McCollom*, 12 F.3d at 971 ("Even if it is unlikely that the firearm would have been accepted for registration, the defendant has cited no statute which makes the possession of short-barreled shotguns illegal."); *Eaton*, 260 F.3d at 1236 ("[w]hether the ATF would have accepted the pipe bomb for registration does not bear on the issue of legal impossibility."). *See also United States v. Shepardson*, 167 F.3d 120, 123 (2nd Cir. 1999) (same); *United States v. Aiken*, 974 F.2d 446, 449 (4th Cir. 1992) ("The fact that not everyone might be able to obtain a short-barreled shotgun, since the BATF must first approve the reasonable necessity and public safety declarations, does not invalidate the NFA as a taxing statute."). *See also Dist. of Columbia v. Heller*, 554 U.S. 570, 624 (2008)

7

("the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns.").

Defendant has not alleged or made any showing that registration of the firearms identified in the indictment was a legal impossibility. Under these circumstances, Tenth Circuit law compels a finding that application of § 5861(d) rationally furthers the NFA scheme for collecting taxes and constitutes a valid exercise of Congress' taxing authority. *McCollom, supra. See also* U.S. CONST. art. I, § 8 ("The Congress shall have Power To lay and collect Taxes"); *Sonzinsky*, 300 U.S. at 514 ("an Act of Congress which on its face purports to be an exercise of the taxing power is not any the less so because the tax is burdensome or tends to restrict or suppress the thing taxed."). Accordingly, defendant Cox's motion to dismiss the indictment must be denied. In view of this finding, the court need not address Cox's additional argument that § 5861 exceeds Congress' power to regulate interstate commerce.

B. Entrapment by estoppel. "The defense of entrapment by estoppel is implicated where an agent of the government affirmatively misleads a party as to the state of the law and that party proceeds to act on the misrepresentation so that criminal prosecution of the actor implicates due process concerns under the Fifth and Fourteenth Amendments." *United States v. Bradley*, 589 F. App'x 891, 896 (10th Cir. 2014) (*quoting United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994), *cert. denied*, 135 S. Ct. 1511, 191 L. Ed. 2d 445 (2015)).

To establish the defense, a defendant must show: (1) an active misleading by a government agent who is responsible for interpreting, administering, or enforcing the

law defining the offense; and (2) actual reliance by the defendant, which is reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation. *Bradley*, <u>589 F. Appx. at 896</u> (*citing United States v. Rampton*, <u>762 F.3d 1152, 1156</u> (10th Cir. 2014)).

Defendant Kettler's assertion of this defense fails to satisfy the first element. He contends he was misled by the State of Kansas (or its legislature), because it represented through adoption of <u>K.S.A. § 50-1204</u> that possession of a silencer that was made in and remained in Kansas was not subject to any federal law.[2] But Kansas officials and representatives are not responsible for interpreting or enforcing the law defining this offense - <u>26 U.S.C. § 5861</u> - which is a federal statute adopted by Congress, interpreted by the courts of the United States, and enforced by the executive branch of the United States. Kansas officials have authority to declare the laws of Kansas, but they have no responsibility for construing or enforcing federal laws such as this. The defense of entrapment by estoppel is not available to defendant in these circumstances. *See Gutierrez-Gonzales*, <u>184 F.3d 1160, 1167</u> (10th Cir. 1999) ("the 'government agent' must be a government official or agency responsible for enforcing the law defining the offense"); *United States v. Stults*, <u>137 F. Appx. 179, 184</u>, <u>2005 WL 1525266</u>, *5 (10th Cir. 2005) (advice given by state probation and state judge was not the advice of a federal official and did not give rise to entrapment by estoppel); *United States v. Hardridge*, <u>379 F.3d 1188, 1195</u> (10th Cir. 2004) (Kansas City Police Department was not responsible for interpretation

---

[2] <u>K.S.A. § 50-1204</u> declares that a firearm accessory which is made in Kansas and which remains in Kansas "is not subject to any federal law, ... *under the authority of congress to regulate interstate commerce.*" [emphasis added]. The provision does not mention Congress' power to levy taxes.

or enforcement of federal firearms law). *See also United States v. Miles*, 748 F.3d 485, 489 (2nd Cir. 2014) (citing "unanimous" rule that state and local officials cannot bind the federal government to an erroneous interpretation of federal law).

Kettler nonetheless argues that the representation in this instance came from "a governing body of such character [as] to render reliance reasonable." Dkt. 32 at 6. But the above cases demonstrate that it is not reasonable to rely upon representations about the validity of federal law from officials who have no authority over federal law.

Kettler contends the *mens rea* for an offense under § 5861 could not possibly have been present. Dkt. 32 at 4. In so arguing, he mistakenly asserts that § 5861 requires proof that he knew possession of an unregistered silencer was a violation of the federal law. *Id.* But in *Staples v. United States*, 511 U.S. 600 (1994), where the defendant was charged with possession of an unregistered machine gun, the Court held only that the government must prove the defendant knew *of the characteristics of his weapon* that made it a firearm under the NFA, not that he knew the NFA required its registration. *See Staples*, 511 U.S. at 622, n.3 (Ginsburg, J., concurring) ("The *mens rea* presumption requires knowledge only of the facts that make the defendant's conduct illegal, lest it conflict with the related presumption, 'deeply rooted in the American system,' that, ordinarily, 'ignorance of the law or a mistake of law is no defense to criminal prosecution.'"); *United States v. Michel*, 446 F.3d 1122, 1130 (10th Cir. 2006) ("Although the government was required to prove Mr. Michel knew the gun was a sawed-off shotgun, it was not required to further prove he knew it was supposed to be registered or that it lacked a serial number.").

10

As such, under § 5861 the government must prove the defendant knew that the device in question was "for silencing, muffling, or diminishing the report of a portable firearm," not that he knew possession of such an unregistered item violated the NFA. *See* 26 U.S.C. § 5845(a)(7) and 18 U.S.C. § 921(a)(24). Whether or not defendant had the requisite knowledge for commission of that offense is a question for the jury to determine from the evidence.

**IT IS THEREFORE ORDERED** this 10th day of May, 2016, that the defendants' motions to dismiss the indictment (Dkts. 29 and 32) are DENIED. Defendants' motions to join in each other's motions (Dkts. 30 and 31) are GRANTED.

   s/ J. Thomas Marten   
J. THOMAS MARTEN, JUDGE

11

Attachment:
# Memorandum and Order, R1.57

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                  Case No. 15-10150-01,02-JTM

SHANE COX, and
JEREMY KETTLER,

        Defendant.

**MEMORANDUM AND ORDER**

    This matter is before the court on the following: Defendant Kettler's Response (Dkt. 48) and the Government's Response (Dkt. 52) regarding a motion in limine; Defendant Cox's Motion for Joinder (Dkt. 50); and the Government's Motion to Oppose Entry of Appearance (Dkt. 48) and Defendant's Response (Dkt. 54).

    1. <u>Responses concerning motion in limine.</u> In orally granting the Government's motion in limine at the hearing on October 26, 2016, the court indicated its conclusion that the Kansas Second Amendment Protection Act (SAPA), and defendants' asserted reliance on it, did not provide a valid defense to the federal charges in the indictment. That ruling was subject to production of a proffer by defendants pertaining to SAPA. Defendant Kettler has now made a proffer representing that the defense would produce the following evidence: that Cox handed out copies of SAPA when he sold silencers to Kettler and others; that Kettler would testify as to his knowledge of SAPA and would assert that he relied on it; that ATF Special Agent Downs would testify that in his

telephone conversation with Kettler, he learned that Kettler "was confused as to the investigation into Cox and his silencers because of the existence of the State law;" and that Cox would likely testify that he made Kettler aware of SAPA when they discussed silencers. Dkt. 48 at 6-7.

The court has not reconsidered its conclusions that SAPA provides no defense to the current charges or that the offenses charged do not require proof that the defendants knew or believed that their actions were against federal law. As the court ruled previously, the defendants cannot claim entrapment by estoppel because Kansas legislators and officials were not responsible for enforcing federal laws such as 26 U.S.C. § 5861. *See e.g. United States v. Gutierrez-Gonzales*, 184 F.3d 1160, 1167 (10th Cir. 1999) (for entrapment by estoppel defense, "the 'government agent' must be a government official or agency responsible for enforcing the law defining the offense"). And under § 5861(d), the Government is required to prove that a defendant knew of the characteristics of his weapon that made it a firearm under the National Firearms Act, but is not required to prove that the defendant knew the NFA required its registration. *Staples v. United States*, 511 U.S. 600 (1994); *United States v. Michel*, 446 F.3d 1122, 1130 (10th Cir. 2006). For that reason, defendants' asserted belief that federal laws did not apply by virtue of SAPA does not negate any element of the offenses charged.

The same is true with respect to the other charges in the indictment. Defendant Kettler contends that the "willfulness" element of an offense under 18 U.S.C. § 1001 makes his asserted reliance on SAPA relevant to Count One. But he is charged with willfully making a false statement to an agent – specifically, representing that he did not

2

pay for or own a silencer that he obtained from Cox. Nothing in SAPA pertains to or purports to excuse willfully making false statements. Similarly, the conspiracy charge in Count Five requires proof that the defendants agreed to commit the underlying offense (§ 5861) – that is, that they knowingly made an agreement to transfer firearms that were not properly registered, with knowledge of the characteristics of the weapons that made them subject to the registration requirement. In sum, defendants' asserted belief that federal law did not prohibit the transfer of such firearms does not negate the *mens rea* required for commission of any of the offenses charged in the indictment.

Despite these legal conclusions, defendant's proffer indicates that references to SAPA are interwoven with the evidence of the alleged offenses. Assuming that to be the case, the court will not attempt in a pretrial ruling to prohibit any mention of SAPA or to excise it from the evidence. Such evidence may be admissible as part of the *res gestae* of the offenses. Additionally, if the defendants testify, the court doubts that it could prohibit them from stating their awareness of SAPA or prevent them from asserting reliance on that law as they describe their mental state at the time of the alleged offenses. Such reliance may be unavailing as a legal matter, but it is ultimately up to the jury to determine whether the Government has proved all of the elements of the offense, including intent.

Assuming evidence of SAPA does come in, the court will have to instruct the jury on the proper consideration of such evidence. The court will explain that the offenses charged do not require proof that a defendant knew that what he was doing was prohibited by federal law, and that a defendant's asserted reliance on SAPA is not a

3

defense to the charges in the indictment. Accordingly, the court reconsiders its prior ruling in limine to the foregoing extent.

2. <u>Defendant Cox's Motion for Joinder</u> (<u>Dkt. 50</u>), which seeks to join in the foregoing proffer to the extent it is applicable to Cox, is granted.

3. <u>Government's Motion to Oppose Entry of Appearance</u> (<u>Dkt. 51</u>). The Government opposes the entry of an additional Assistant Federal Public Defender to represent defendant Cox. *See* Dkts. 49, 53. The Government argues that additional attorneys cannot be appointed under the CJA, but it cites nothing to show that an appearance by an additional attorney from within the same Federal Public Defender office that was appointed in the first instance is improper.

**IT IS THEREFORE ORDERED** this 7th day of November, 2016, that the court's prior in limine ruling (<u>Dkt. 46</u>) is reconsidered to the extent stated above. Defendant Cox's Motion for Joinder (<u>Dkt. 50</u>) is GRANTED. The Government's Motion to Oppose Entry of Appearance (<u>Dkt. 51</u>) is DENIED.

_____s/ J. Thomas Marten_____
J. THOMAS MARTEN, JUDGE

Attachment:
# Memorandum and Order, R1.85

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                  Case No. 15-10150-01,02-JTM

SHANE COX and
JEREMY KETTLER,

        Defendants.

**MEMORANDUM AND ORDER**

    This matter is before the court on defendant Shane Cox's motion to dismiss (Dkt. 63). Defendant Jeremy Kettler joins in the motion. The motion argues that the National Firearms Act (NFA) is unconstitutional because it amounts to "regulatory punishment" rather than imposition and enforcement of a valid federal tax. Defendants further argue that the NFA violates the Second and Tenth Amendments to the U.S. Constitution. Dkts. 63, 78.

    This case has generated significant interest within the District of Kansas and beyond. Many concerned persons have written emails or called the court's chambers to express their views. Judges are not allowed to publicly comment on pending cases, but I believe it is important to give a clear explanation of the court's decision and the reasons behind it to all who are interested. In order to do that, I begin with a summary of the court's obligations, the relevant law, and how the law applies to the facts of the case.

Before assuming office, every justice or judge of the United States courts must take the following oath:

> I [name], do solemnly swear (or affirm) that I will administer justice without respect to persons, and do equal right to the poor and to the rich, and that I will faithfully and impartially discharge and perform all the duties incumbent upon me as [a judge] under the Constitution and laws of the United States. So help me God.

28 U.S.C. § 453.

This oath requires a judge to uphold the Constitution and laws of the United States, as interpreted by the United States Supreme Court and the Tenth Circuit Court of Appeals. Where there is a decision on any point of law from the Supreme Court or the Tenth Circuit, or both, I am bound to follow those decisions. This is true whether the decision is absolutely identical, or whether it sets out a principle of law that applies equally to different facts. As a district court judge, I am not empowered to do what I think is most fair – I am bound to follow the law.

The U.S. Constitution provides in part that the Constitution and laws of the United States "shall be the supreme Law of the Land," binding all judges in every state, "any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." In other words, United States District Courts are bound by federal law, even if a state law says something to the contrary.

The National Firearms Act (26 U.S.C. § 5861 et seq.) is a federal law that imposes a tax and licensing requirement on firearms dealers. It includes silencers among the items subject to registration and taxation. Eighty years ago, the Supreme Court upheld the NFA as a valid exercise of Congressional taxing power. *Sonzinsky v. United States*,

2

300 U.S. 506 (1937). The Supreme Court reaffirmed this point in *Nat'l. Fed'n of Indep. Bus.*
*Women v. Sebelius*, 132 S.Ct. 2566 (2012). Further, the Supreme Court has held that if
Congress has exercised a valid power, such as its taxing power, then the Tenth
Amendment "expressly disclaims any reservation of that power to the States." *New York*
*v. United States*, 505 U.S. 144, 156 (1992).

This leaves the Second Amendment. The Supreme Court, while recently
recognizing that individuals have a right to "keep and bear Arms," also said that the
Second Amendment is not absolute, and that nothing in its decision should be
interpreted "to cast doubt on … laws imposing conditions and qualifications on the
commercial sale of arms." *Dist. of Columbia v. Heller*, 128 S.Ct. 2783, 2816-17. The
National Firearms Act is such a law.

As is more fully set out below, the Constitution and Supreme Court decisions
discussed in this opinion compel the result this court reaches in upholding the
constitutionality of the National Firearms Act and in denying the defendants' motion to
dismiss.

### I. Supremacy Clause.

The Constitution of the United States provides in part that "[t]his Constitution,
and the Laws of the United States which shall be made in Pursuance thereof …shall be
the supreme Law of the Land; and the Judges in every State shall be bound thereby, any
Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S.
Const., art. VI. This necessarily makes the question presented by defendant's motion
one of federal law. If the NFA is otherwise consistent with the U.S. Constitution and is a

3

valid exercise of Congress's power to tax spelled out in the Constitution, then it is "the supreme Law of the Land," notwithstanding "any Thing in the … Laws of any State to the Contrary."

The defendants argue that Kansas's adoption of the Second Amendment Protection Act (SAPA), K.S.A. § 50-1204, somehow rendered the National Firearms Act unconstitutional. Dkt. 63 at 6. This court has no authority to construe SAPA or to determine what it means; that is a task reserved to the Kansas courts. But the Constitution could not be clearer on one point: if the National Firearms Act is a valid exercise of Congressional taxing power, and if it does not infringe on rights granted in the U.S. Constitution, then it is the "supreme Law of the Land," regardless of what SAPA says.

### II. Is the NFA a valid exercise of Congress's taxing authority?

The Constitution gives the Congress certain enumerated powers. Among those is the authority to impose and collect taxes, and to enact laws for carrying out the taxing regimen. *See* U.S. Const., art. I, § 8 (The Congress shall have Power to lay and collect Taxes,… to pay the Debts and provide for the common Defence and general welfare of the United States" [and] "To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers").

In 1937, the Supreme Court of the United States addressed "whether section 2 of the National Firearms Act …, which imposes a $200 annual license tax on dealers in firearms, is a constitutional exercise of the legislative power of Congress." *Sonzinsky v. United States*, 300 U.S. 506, 511 (1937). The case involved the criminal conviction of a

4

man charged with unlawfully carrying on a business as a dealer in firearms without
having registered or paid the tax required by the NFA. The defendant argued "that the
present levy is not a true tax, but a penalty imposed for the purpose of suppressing
traffic in a certain noxious type of firearms, the local regulation of which is reserved to
the state because [it is] not granted to the national government." *Id*. at 512. He argued
that the cumulative effect of imposing taxes on the manufacturer, dealer, and buyer of a
covered firearm was "prohibitive in effect and … disclose[s] unmistakably the
legislative purpose to regulate rather than to tax." *Id*. at 512-13. The Supreme Court
flatly rejected the argument, finding that because the NFA "is not attended by an
offensive regulation, and since it operates as a tax, it is within the national taxing
power." *Id*. at 513.

    *Sonzinsky* has never been reversed, vacated or modified by the Supreme Court.
Only recently, in *Nat'l Fed'n Of Indep. Bus. Women v. Sebelius*, 132 S.Ct. 2566 (2012),
where the Supreme Court upheld the Affordable Care Act's "individual mandate" as a
valid exercise of Congress's taxing power, the Court cited *Sonzinsky* for the proposition
that a tax is not invalid merely because it seeks to influence behavior, noting "we have
upheld such obviously regulatory measures as taxes on selling … sawed-off shotguns,"
and observing that "[e]very tax is in some measure regulatory" because it "interposes
an economic impediment to the activity…." *Nat'l Fed'n of Indep. Bus. Women*, 132 S.Ct. at
2596 (citing *Sonzinsky*, 300 U.S. at 506, 513)). Because *Sonzinsky* remains a valid Supreme
Court decision, it is "the supreme Law of the Land" on this issue.

Defendant urges the court to find the NFA invalid based on the observation in *Nat'l Fed'n of Indep. Bus. Women* that "there comes a time in the extension of the penalizing features of [a] so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment." *Id.*, 132 S.Ct. at 2599-2600. That argument, however, is precisely the one rejected by the Supreme Court in *Sonzinsky*. Unless or until the Supreme Court decides otherwise, this court is bound by *Sonzinky's* conclusion that the NFA represents a valid exercise of Congress's constitutional power to levy taxes. *See also United States v. Houston*, 103 Fed.Appx. 346, 349–50 (10th Cir. 2004) ("Mr. Houston fails to establish 26 U.S.C. § 5861(d) and its parent act are beyond Congress's enumerated power to either regulate commerce through firearms registration requirements, or impose a tax thereon."); *United States v. Roots*, 124 F.3d 218 (Table), 1997 WL 465199 (10th Cir. 1997) ("*Lopez* does not undermine the constitutionality of § 5861(d) because that provision was promulgated pursuant to Congress's power to tax"). The same conclusion has been reached by every federal court of appeals to have addressed the issue since adoption of the NFA.[1]

---

[1] *See United States v. Village Center*, 452 F.3d 949, 950 (8th Cir. 2006) ("irrespective of whether § 5861(c) is a valid exercise of Congress's commerce clause authority … it is a valid exercise of Congress's taxing authority"); *United States v. Lim*, 444 F.3d 910, 914 (7th Cir. 2006) ("Section 5861(d), as applied to Lim's possession of the sawed-off shotgun, is a valid use of Congress's taxing power"); *United States v. Pellicano*, 135 F. Appx. 44, 2005 WL 1368077 (9th Cir. 2005) (valid exercise of taxing power); *United States v. Oliver*, 208 F.2d 211 Table), 2000 WL 263954 (4th Cir. 2000) (the weapon need not have traveled in interstate commerce because § 5861 "has been held to be a valid exercise of the power of Congress to tax"); *United States v. Gresham*, 118 F.3d 258, 261-62 (5th Cir. 1997) ("Gresham charges that Congress has used the taxing power as a pretext to prohibit the possession of certain disfavored weapons, without any rational relationship to the revenue-raising purposes of the Internal Revenue Code. … To the contrary, it is well-settled that § 5861(d) is constitutional because it is 'part of the web of regulation aiding enforcement of the transfer tax provision in § 5811.'"); *United States v. Dodge*, 61 F.3d 142, 145 (2nd Cir. 1995) (the registration requirement "bears a sufficient nexus to the overall taxing scheme of the NFA and, therefore, assists the government in collecting revenues.").

6

Defendant cites the Tenth Amendment and argues that the NFA is invalid because it has "invaded an area of law that has traditionally been reserved to the States." Dkt. 63 at 6. But if the NFA is otherwise consistent with the Constitution and constitutes a valid exercise of Congress's taxing power – as the Supreme Court said it did in *Sonzinsky* – then it does not run afoul of the Tenth Amendment. *See New York v. United States,* 505 U.S. 144, 156 (1992) ("If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States."). Again, the Supreme Court in *Sonzinsky* specifically rejected the defendant's claim that the NFA was invalid because it regulated on a matter that was reserved to the states. *Sonzinsky,* 300 U.S. at 512.

### III. Is the NFA consistent with the Second Amendment?

Defendant's original motion to dismiss did not argue that the NFA violates the Second Amendment. *See* Dkt. 63. His response to the State of Kansas's brief, however, relies almost exclusively on the Second Amendment. Dkt. 78. Be that as it may, a review of case law shows that defendant's Second Amendment argument is also foreclosed by Supreme Court precedent.

The Second Amendment provides that "the right of the people to keep and bear Arms … shall not be infringed." U.S. Const. amend II. In striking down a District of Columbia statute that essentially prohibited the possession of useable handguns in the home, the Supreme Court held that the Second Amendment "confer[s] an individual

right to keep and bear arms." *Dist. of Columbia v. Heller*, <u>128 S.Ct. 2783</u> (2008). This amendment protects the right of law-abiding citizens to keep and bear arms that are in common use for traditionally lawful purposes, such as self-defense. *See also McDonald v. City of Chicago, Ill.*, <u>561 U.S. 742, 767</u> (2010) ("in *Heller*, we held that individual self-defense is 'the *central component*' of the Second Amendment right.") (citing *Heller*, emphasis in original).

"Like most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 2816. *Heller* noted the amendment did not confer a right to keep and carry *any* weapon for *any purpose* whatsoever. For example, the Court observed that prohibitions on carrying concealed weapons had long been upheld under the Second Amendment and under similar state laws. *Id.* Without defining the precise scope of the right to keep and bear arms, the Supreme Court pointed out that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, *or laws imposing conditions and qualifications on the commercial sale of arms*." *Id.* at 2816-17 (emphasis added).

In *United States v. Miller*, <u>307 U.S. 174</u> (1939), two defendants were criminally charged with violating the NFA by transporting a short-barreled shotgun in interstate commerce without paying the tax and obtaining the approval required by the NFA. A U.S. District Court dismissed the charge, finding that it violated the Second Amendment. But the Supreme Court reversed that ruling because "we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument." *Id.*

8

at 178.[2] In *Heller*, the Supreme Court reviewed *Miller* and indicated that it remains good law, stating: "We therefore read *Miller* to say … that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope" of the Second Amendment right. *Heller*, 128 S.Ct. at 2815-16. So, as *Miller* holds, the Second Amendment protects the sorts of weapons "in common use" but does not extend to "the carrying of 'dangerous and unusual weapons.'" *Heller*, 128 S.Ct. at 2817.

Defendant Cox was convicted of three different types of NFA violations. The first (Count 3) was for possessing a short-barreled rifle without registering it and paying the tax required by the NFA. Such a weapon is clearly comparable to the short-barreled shotgun at issue in *Miller*. No suggestion or showing is made that short-barreled rifles have been in common use by law-abiding citizens for lawful purposes. The court must therefore conclude under *Miller* that they fall outside the scope of the Second Amendment. *See Heller*, 128 S.Ct. at 2814 ("*Miller* stands … for the proposition that the Second Amendment right … extends only to certain types of weapons."); *United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) ("It is clear … that the [NFA's] object was to regulate certain weapons likely to be used for criminal purposes, just as

---

[2] At the time of the *Miller* decision, the firearms covered by the NFA included "a muffler or silencer for any firearm…." *See Miller*, 307 U.S. at 175, n.1 (quoting Act of June 26, 1934, c. 757, 48 Stat. 1236-1240, 26 U.S.C.A. § 1132 *et seq.*). The NFA at that time also provided that "[a]ny person who violates or fails to comply with any of the requirements of [this Act] shall, upon conviction, be fined not more than $2,000 or be imprisoned for not more than five years, or both, in the discretion of the court." *Id. Miller* also rejected an argument that the NFA was not a valid revenue measure, stating that "[c]onsidering *Sonzinsky v. United States*, [supra, and other cases] the objection that the Act usurps police power reserved to the States is plainly untenable." 307 U.S. at 177-78.

the regulation of short-barreled rifles, for example, addresses a concealable weapon likely to be so used"); *United States v. Gonzales*, 2011 WL 5288727 (D. Utah Nov. 2, 2011) (short-barreled rifle was not a constitutionally protected arm under *Heller*); *United States v. Barbeau*, 2016 WL 1046093, *4 (W.D. Wash. Mar. 16, 2016) (defendant's possession of a short-barreled rifle was not protected by the Second Amendment); *United States v. Gilbert*, 286 F.App'x 383, 386, 2008 WL 2740453 (9th Cir. 2008) ("Under *Heller*, individuals still do not have a right to possess [machine guns] or short-barreled rifles").

The second type of violation at issue here was making, possessing, or transferring silencers without registering or paying the tax required by the NFA. While it is certainly possible to possess silencers for lawful purposes, no showing is made that they are a type of arm "in common use" covered by the Second Amendment. *See United States v. McCartney*, 357 F.App'x 73, 77, 2009 WL 4884336, *3 (9th Cir. 2009) ("Silencers, grenades, and directional mines are not 'typically possessed by law-abiding citizens for lawful purposes' … and are less common than either short-barreled shotguns or machine guns."); *United States v. Perkins*, 2008 WL 4372821, *4 (D. Neb. Sept. 23, 2008) ("silencers/suppressors 'are not in common use by law abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use'"); *United States v. Garnett*, 2008 WL 2796098, *4 (E.D. Mich. July 18, 2008) ("Nothing in [*Heller*] … casts doubt on the constitutionality of federal regulations over [machine guns] and silencers at issue in this case."). Because the foregoing arms are outside the scope of Second Amendment

protection, the application of the NFA to persons possessing, transferring or making such items does not infringe on Second Amendment rights.

Finally, defendant Cox's third type of conviction was for engaging in business as a dealer or manufacturer of silencers without paying the appropriate federal tax and registering. Defendant's motion does not address this charge specifically, but it is clearly one of the federal "laws imposing conditions and qualifications on the commercial sale of arms" that *Heller* said were permissible under the Second Amendment. Regardless of the level of scrutiny applied, a long-standing NFA regulation requiring a commercial firearms dealer to obtain a federal license and pay the federal tax required by the NFA before engaging in the firearms business would clearly pass muster under the Second Amendment. *See United States v. Hosford*, 843 F.3d 161, 166 (4th Cir. 2016) ("the prohibition against unlicensed firearm dealing is a longstanding condition or qualification on the commercial sale of arms and is thus facially constitutional"). In sum, binding Supreme Court precedent – i.e., *Sonzinsky, Miller, and Heller* - shows that the NFA, both on its face and as applied, is a valid and constitutional exercise of Congress's authority to levy taxes.[3]

---

[3] It bears pointing out how different the NFA is from the statute struck down in *Heller*. *Heller* involved a law *banning* an "entire class of 'arms' that [was] overwhelmingly chosen by American society" for the lawful purpose of self-defense, and it extended the ban "to the home, where the need for defense of self, family, and property is most acute." *Heller*, 128 S.Ct. at 2817. By contrast, the NFA deals with weapons or accessories not in common use, and it does not ban possession of those items, but only requires that a person register and pay a federal tax before possessing them.

11

### IV. Congress's authority to regulate interstate commerce.

The U.S. Constitution also gives Congress the power "To regulate Commerce … among the several States…." U.S. Const., art. I, § 8. The Supreme Court has held that this clause does not permit Congress to regulate purely local activities. *See United States v. Lopez*, <u>514 U.S. 549</u> (1995). But Supreme Court case law also "firmly establishes Congress's power to regulate purely local activities that are part of an economic 'class of activities' that have a substantial effect on interstate commerce." *Gonzales v. Raich*, <u>545 U.S. 1, 17</u> (2005). Thus, "[w]hen Congress decides that the 'total incidence' of a practice poses a threat to a national market, it may regulate the entire class." *Id*.[4]

The court's conclusion that the NFA is a valid exercise of Congress's taxing power makes it unnecessary to decide whether the NFA is also a valid exercise of Congress's power to regulate interstate commerce. *Cf. Montana Shooting Sports Ass'n. v. Holder*, <u>727 F.3d 975, 982</u> (9th Cir. 2013), *cert. denied*, <u>134 S.Ct. 955</u> (Jan. 13, 2014) (finding that under *Raich*, Congress can exercise its commerce power to validly regulate manufacture of firearms made within the State of Montana, notwithstanding Montana

---

[4] In *Raich*, the question was whether Congress could regulate a person's possession of medical marijuana in California when the marijuana was entirely locally grown and locally possessed, and was lawful to possess under California law. The Supreme Court found that "[g]iven the enforcement difficulties that attend distinguishing between marijuana cultivated locally and marijuana grown elsewhere, … and concerns about diversion into illicit channels, we have no difficulty concluding that Congress had a rational basis for believing that failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the [Controlled Substances Act]." *Raich*, <u>545 U.S. at 22</u>. Thus, Congress "was acting well within its authority to 'make all Laws which shall be necessary and proper' [to] 'regulate Commerce … among the several States.'" *Id. See also id*. at 35 (Scalia, J., concurring) ("Where necessary to make a regulation of interstate commerce effective, Congress may regulate even those intrastate activities that do not themselves substantially affect interstate commerce.").

Firearms Freedom Act declaring otherwise). Accordingly, the court does not address that issue.

### V. Conclusion.

The Supreme Court cases cited above establish that the NFA provisions under which defendants were convicted are valid and constitutional acts adopted by Congress pursuant to its authority to levy and enforce the collection of taxes. As such, they constitute the "the supreme Law of the Land," notwithstanding "any Thing in the … Laws of any State to the Contrary." U.S. Const., art. VI.

IT IS THEREFORE ORDERED this 31st day of January, 2017, that the defendants' motion to dismiss (Dkt. 63) is DENIED.

_____s/ J. Thomas Marten_____
J. THOMAS MARTEN, JUDGE

13

Attachment:

# Jury Instructions 13, 15, 16, 17, 18, 19, 20

Instruction No.  *13*

Defendant Shane Cox is charged in Counts 2, 3, and 4 with violations of 26 U.S.C.

§ 5861(d). Defendant Jeremy Kettler is charged in Count 13 with a violation of § 5861(d).

Section 5861(d) makes it unlawful for anyone to possess a firearm covered by the

National Firearms Act that is not registered to that person in the National Firearms

Registration and Transfer Record.

To find a defendant guilty of any of the offenses charged in Counts 2, 3, 4, or 13,

the government must prove each of the following essential elements as to that

defendant beyond a reasonable doubt:

> *First*: That the defendant knowingly possessed a firearm as alleged in that count;

> *Second*: That the defendant knew of the characteristics or features of the firearm that caused it to be registrable under the National Firearms Registration and Transfer Record;

> *Third*: That the firearm was or readily could have been put in operating condition; and

> *Fourth*: That the firearm was not registered to the defendant in the National Firearms Registration and Transfer Record. The government is not required to prove that the defendant knew that the firearm was not registered or had to be registered.

Affirmative defense – Counts 2 and 4 charge Shane Cox with unlawful

possession of destructive devices. It is a defense to such a charge that an item alleged to

be a destructive device was not designed or redesigned for use as a weapon. For

example, an inert grenade is not a destructive device. As to Count 2 and 4, if you find

that the item alleged to be a destructive device was not designed or redesigned to be

used as a weapon, then you should find defendant Shane Cox not guilty as to that

count.

Instruction No. *15*

Defendant Shane Cox is charged in Counts 6, 7, 8, 9 and 11 with violations of 26 U.S.C. § 5861(e).

Section 5861(e) makes it unlawful for any person to knowingly transfer a firearm in violation of the National Firearms Act. The National Firearms Act requires that before a firearm may be transferred, the transferor must register the firearm to the transferee on the National Firearms Registration and Transfer Record.   The term "transfer" includes selling, renting, loaning, giving away, or otherwise disposing of. The government does not have to prove ownership of a firearm to show that it was transferred.

To find defendant Shane Cox guilty of any of the offenses charged in Counts 6, 7, 8, 9, or 11, the government must prove each of the following essential elements beyond a reasonable doubt:

*First*, That the defendant transferred a firearm as alleged in that count;

*Second*, That the defendant did so knowingly;

*Third*, That the defendant knew of the characteristics or features of the firearm that made it registrable under the National Firearms Registration and Transfer Record; and

*Fourth*, That at the time of the transfer, the firearm was not registered to the transferee on the National Firearms Registration and Transfer Record. The government is not required to prove that the defendant knew that the firearm was not registered or had to be registered.

# Instruction No. 16

Defendant Shane Cox is charged in Count 10 with a violation of 26 U.S.C. § 5861(f).

Section 5861(f) makes it unlawful for any person to make a firearm in violation of the provisions of the National Firearms Act. The National Firearms Act requires each maker of a firearm to register the firearm in the National Firearms Registration and Transfer Record. The maker must do so by obtaining authorization, prior to making the firearm, from the United States Bureau of Alcohol, Tobacco, Firearms and Explosives.

To find defendant Shane Cox guilty of the offense charged in Count 10, the government must prove each of the following essential elements beyond a reasonable doubt:

*First*: That the defendant made a firearm as alleged in Count 10;

*Second*: That the defendant did so knowingly;

*Third*, That the defendant knew of the characteristics or features of the firearm that made it registrable under the National Firearms Registration and Transfer Record; and

*Fourth*: The defendant did so without obtaining authorization, prior to making the firearm, from the Bureau of Alcohol, Tobacco, Firearms and Explosives.

The term "make" includes manufacturing, putting together, altering, or otherwise producing a firearm.

Instruction No. *17*

Defendant Shane Cox is charged in Count 12 with a violation of 26 U.S.C. § 5861(a).

Section 5861(a) makes it unlawful for any person to engage in business as a manufacturer or dealer in firearms without having paid the special occupational tax required by Section 5801, or without having registered as required by Section 5802. The term "manufacturer" means any person who is engaged in the business of manufacturing firearms. The term "dealer" means any person, not a manufacturer or importer, engaged in the business of selling, renting, leasing, or loaning firearms.

Section 5801 requires that every manufacturer or dealer in firearms pay, upon first engaging in business and thereafter by July 1st of each year, a special federal occupational tax for each place of business. Section 5802 requires that every manufacturer or dealer in firearms, upon first engaging in business and thereafter by July 1st of each year, must register his name, including any trade name, and the address of his business, with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

To find defendant Shane Cox guilty of the offense charged in Count 12, you must be convinced that the government has proved each of the following essential elements beyond a reasonable doubt:

*First*: That the defendant was engaged in the business of manufacturing or dealing in firearms, that is, silencers, as alleged in Count 12;

*Second*: That the defendant did so knowingly;

*Third,* That the defendant knew of the characteristics or features of the firearm that made it registrable under the National Firearms Registration and Transfer Record; and

*Fourth*: That the defendant did so without paying the tax required by Section 5801, or without registering his business as required by Section 5802.

Instruction No. /8

When the word "knowingly" is used in these instructions, it means that the act was done voluntarily and intentionally, and not because of mistake or accident. The government is not required to prove that a defendant knew that his acts were unlawful.

# Instruction No. $19$

You heard some evidence about a Kansas law known as the "Second Amendment Protection Act." That Act states in part that "a firearm accessory that is manufactured … and owned in Kansas and that remains within the borders of Kansas is not subject to any federal law … including any federal firearm … registration program, under the authority of congress to regulate interstate commerce."

There is also a Kansas statute that prohibits "possessing any device or attachment of any kind designed, used or intended for use in suppressing the report of any firearm," unless that person is in compliance with the National Firearms Act.

Section 5861 of the National Firearms Act, the federal law the defendants are charged with violating, was passed by Congress under its authority to levy taxes. As you will see in the instructions, one of the elements of an offense under § 5861 is that a defendant must have known of the characteristics of the firearm that made it registrable. The government is not required to prove, however, that a defendant knew that the National Firearms Act required a firearm with those characteristics to be registered. For that reason, it is not a defense to a charge under § 5861 that a defendant may have believed, based on a Kansas law, that the National Firearms Act did not require registration of a firearm.

# Instruction No. 20

The question of intent is also a matter for you, as jurors, to determine. Intent is a state of mind. Since it is not possible to look into a person's mind to see what went on, the only way you have of arriving at the intent of the defendant is for you to take into consideration all of the facts and circumstances shown by the evidence, including the exhibits, and determine from all such facts and circumstances what the intent of the defendant was at the time in question.

Similarly, the government may prove motive through circumstantial evidence because there is no way of directly scrutinizing the human mind to reveal precisely what someone was thinking at any given moment.

Attachment:

Transcript excerpts containing rulings on jury
instructions: R3.110 at 40, 46-50, 62-64, 66

579

```
 1   will be at 1:00 o'clock when we do the instructions and

 2   then the closing arguments.

 3           All right.  We're in recess.

 4           (Brief recess taken.  Proceedings then

 5           continue in the conference room with both

 6           defendants present:)

 7           THE COURT:  All right.  Well, the first thing,

 8   and of course this is on the record for the moment, is

 9   I am not going to give the proposed instructions that

10   the defendants had proffered with respect to good

11   faith.  And I think that I've already stated the

12   reasons for that on two or three occasions, but your

13   record is preserved by having filed them.  And as well

14   as your motion and your supporting memorandum.

15           MR. HENRY:  Your Honor.

16           THE COURT:  And I don't think I need to hear

17   anything else but, Tim, if you really feel compelled,

18   go right ahead.

19           MR. HENRY:  Well, actually, there's a --

20   getting into this further, the -- it is our belief, and

21   in fact I think there's some, having reread Staples,

22   which the Court wanted us to look at, what I find

23   interesting is, is that the issue there, the defense

24   that was raised in Staples was the person didn't even

25   know that the gun that had been transferred to him had
```

585

```
 1  wants to have their cake and eat it, too, no offense to

 2  Rich, of course, but it just seems that they're

 3  inconsistent and if that defense is available in Cheek,

 4  I think it should be available to us in this type of a

 5  case.

 6          But that's all I have, Your Honor.

 7          THE COURT:  Thank you.  Ian, there anything

 8  you want to add?

 9          MR. CLARK:  Your Honor, I had all sorts of

10  clever things prepared for you but since those two

11  counts got dismissed I would just, I guess, echo and

12  adopt on the record the argument made by counsel for

13  Mr. Cox, and then I'll just file a motion to that

14  effect here shortly.  So in case that doesn't get done

15  until after we get to work, you know --

16          THE COURT:  We've got you on the record here

17  joining in, and that's fine.

18          MR. CLARK:  Okay.  Thank you, Judge.

19          THE COURT:  You bet.

20          Rich?

21          MR. HATHAWAY:  Judge, we don't have anything

22  really additionally.  We believe that the instructions

23  correctly state the law of the case and we have no

24  suggestions or additions.

25          THE COURT:  Well, you know, this is one of
```

586

 1  those -- you know, "interesting" is an appropriate term

 2  but -- but cockamamie may be about as close as

 3  anything, as one takes a look at the Second Amendment

 4  Protection Act and what it purports to do, and what it

 5  actually does do because if the State chose to

 6  prosecute Mr. Cox and Mr. Kettler for owning a

 7  silencer, which it could do, or a suppressor, it's

 8  not -- the Second Amendment Protection Act is not a

 9  defense, unless they have registered under the National

10  Firearms Act.

11          Now, you know, far be it from me to spank the

12  State legislature about anything that it does but this

13  was not a carefully thought out statute, and the other

14  side of this, and -- is that it's really not even the

15  other side but this issue is not going to get resolved

16  if I find in favor of the defendants on this motion.

17          Of course we don't know what the jury's going

18  to do, you know, the Government put on a strong case; I

19  think that both Mr. Cox and Mr. Kettler have indicated

20  to the jury, and I've allowed them to testify that they

21  really thought that what they were doing was fine under

22  the Second Amendment Protection Act.  Sadly, that is

23  not the law and if they are found not guilty at the

24  conclusion of the case, that's the end of the case.

25          It is only if they are convicted that they can

587

```
 1  take this issue to a court that actually can lay down a
 2  meaningful precedent and can really clarify this.
 3          Now you know, a conditional plea I think
 4  probably would have allowed that issue to go up, but
 5  we're not dealing with a conditional plea situation
 6  here.  I think it would be wonderful if this got
 7  resolved, because I think this is just the first of
 8  what will be a number of these kinds of cases that are
 9  brought and until the Tenth Circuit and maybe,
10  ultimately, the Supreme Court says one way or another
11  the supremacy clause is there, nobody has challenged
12  the constitutionality of the Second Amendment
13  Protection Act here, although we have, I think --
14  everybody has put the Attorney General's Office on
15  notice that this issue is hanging out there and,
16  frankly, and again, this has nothing to do with the
17  merits of the elements of the case or any potential
18  defenses, Mr. Cox, and Mr. Kettler don't really appear
19  to me to pose any kind of a threat, this is not, as far
20  as can I tell, a militia group that's out there that's
21  attempting to arm itself and preparing for some kind of
22  insurrection.
23          My personal view is that Mr. Cox has some
24  skills, I think he did believe that this statute gave
25  him cover or he wouldn't have been making these things,
```

588

1  but the old saying that ignorance of law and even

2  confusion over what the law is, you know, if there is

3  any issue at all, you act at your risk in terms of

4  potential prosecution, and I think that's just where we

5  are here.

6          So while I am personally sympathetic to

7  allowing that as a defense, I don't think it's what the

8  law is.  And I took an oath, as everybody knows, to

9  follow the law, whether I agree with it or not.  And I

10  think in this circumstance, the Second Amendment

11  Protection Act, for all that it purports to do, has

12  done more harm to people like Mr. Cox, and Mr. Kettler,

13  than it has done in protecting persons and, you know,

14  again, just thinking out loud, that act which allows

15  for prosecution of federal persons who bring

16  prosecutions, that goes nowhere.

17          I mean, if you feel that you are acting as a

18  law enforcement person or as a judicial officer in

19  a -- under color of or if there's a good faith basis

20  for your position, you've got immunity and so

21  it's -- anyway, I am sure that this will spawn not only

22  an appeal at some point, these issues, and not only in

23  the federal courts but I expect the Kansas Supreme

24  Court's going to be taking a look at the Second

25  Amendment Protection Act and making some decisions

589

1  about how that actually works.

2        So, fellas, I am not unsympathetic to where

3  you are, but the law just takes me in a different

4  direction and so that's where we are with the case.

5        And as I say, a conditional plea would have

6  allowed these issues to be taken up to the Circuit and

7  gotten a determination and, you know, the Circuit still

8  may end up, if you're convicted in this case, may end

9  up taking your position and if that's the case, even

10  that it's cost you a lot of time and a lot of money

11  that can't be repaid, principle is obviously important

12  and you may be vindicated on principle, but right now

13  Mr. Hathaway is doing what he is supposed to be doing,

14  your lawyers are doing what they are supposed to be

15  doing.  We're all, I think, here operating in absolute

16  good faith and this has turned out to be a much more

17  interesting, and I mean that in the best sense of the

18  word, and a much more difficult case than what, if you

19  just take a quick look at the Indictment or the

20  Superseding Indictment in the case, than what it would

21  appear to be because we see gun counts all the time;

22  they're almost as common as drug counts.

23        And but, you know, did either of you represent

24  Judah Prince --

25        MR. HENRY:  I did.

601

```
 1              MR. CLARK:  No objection.

 2              THE COURT:  Number 13 notes that Mr. Cox is

 3    charged in Counts 2, 3, and 4 with violations of

 4    26-5861(d).

 5              And Mr. Kettler is charged with, in Count 13,

 6    with violation of 5861(d) and it goes through the

 7    elements.

 8              MR. HENRY:  Your Honor, I would just renew the

 9    previous introductory objection regarding the level of

10    knowledge or intent in this case and adopt those

11    arguments here and ask that the last sentence in

12    element four be stricken, consistent with those

13    arguments.

14              THE COURT:  Mr. Clark.

15              MR. CLARK:  We would adopt that argument,

16    Judge.

17              THE COURT:  All right.  That's overruled.

18              Instruction Number 14 talks about actual and

19    constructive possession.

20              MR. HENRY:  Um, no objection.  No objection.

21              MR. CLARK:  No objection.

22              THE COURT:  Instruction Number 15 is elements

23    of 6, 7, 8, 9, and 11, the violations of 26-5861(e).

24              MR. HENRY:  Again, I would just adopt the

25    introductory objections regarding the level of intent
```

602

1   and knowledge and ask that the last sentence in element

2   four be stricken, consistent with those arguments.

3          MR. CLARK:  We would adopt, Your Honor.

4          THE COURT:  All right.  That's overruled.

5   We'll give 15 as proposed.

6          16 is Mr. Cox and the charge in Count 10,

7   violation of 5861(f).

8          MR. HENRY:  Your Honor, I just believe that

9   the -- there should be an element there that explains

10   that he has to know that his knowledge, level of intent

11   that makes it -- that his knowledge is that he is doing

12   something unlawful.

13          THE COURT:  All right.  That's overruled.

14          And it doesn't apply, of course, to

15   Mr. Kettler, but any objection, Mr. Clark?

16          MR. CLARK:  I suppose we just adopt, Your

17   Honor, to go with continuity.

18          THE COURT:  That's fine.

19          Instruction Number 17 is the elements

20   instruction, Count 12, violation of 26-5861(a).

21          MR. HENRY:  Same objection as the previous

22   one, Your Honor, regarding the element of knowledge.

23          THE COURT:  Thank you.

24          MR. CLARK:  Adopted, Your Honor.

25          THE COURT:  Instruction -- and those are

603

1   overruled.

2          Instruction Number 18 defines "knowingly."

3          MR. HENRY:  Your Honor, we would be object to

4   this instruction and, again, we believe that

5   the -- based upon the introductory objections being

6   made and/or proposal, we believe that the knowledge

7   element is -- is not sufficient and we believe a good

8   faith instruction should be given.  And this -- and

9   this relates, I think, to the next couple instructions,

10  as well.

11         THE COURT:  Thank you very much, Mr. Henry.

12         MR. CLARK:  And we adopt that position, Your

13  Honor.

14         THE COURT:  Thank you, Mr. Clark.

15         MR. CLARK:  Sentence to alleviating what we

16  believe to be a current burden.

17         THE COURT:  Thank you very much, Mr. Clark,

18  and those objections are overruled.

19         Instruction Number 19 is the Second Amendment

20  Protection Act.

21         MR. HENRY:  Your Honor, I think that there's a

22  missing word in the first paragraph where it says, Not

23  subject -- or is not subject any federal law, I think

24  it's not subject to any federal law.

25         THE COURT:  I think that's probably right,

605

```
 1          Mr. Clark?

 2          MR. CLARK:  We would join in that and then

 3  also, I guess highlight the fact that I don't think

 4  there's factual basis in the evidence for that.

 5          THE COURT:  All right.

 6          MR. CLARK:  That paragraph.

 7          THE COURT:  Well, I am going to overrule the

 8  objections and we'll give Number 19 with that one

 9  correction to the statute to the language.

10          Instruction Number 20 is the intent

11  instruction.

12          MR. HENRY:  Again, I -- I mean, I'm not

13  opposed to the instruction, I just think that somewhere

14  in these last numbered instructions the good faith

15  instruction should have been placed when we're talking

16  about one's intent.

17          THE COURT:  Thank you.

18          Mr. Clark?

19          MR. CLARK:  We would adopt, Your Honor.

20          THE COURT:  Thank you.  Those are overruled.

21          MR. CLARK:  Okay.

22          THE COURT:  20 will be given as we proposed

23  it.

24          Instruction Number 21 notes that Mr. Cox and

25  Mr. Kettler are not on trial for any act or conduct not
```

Attachment:

# Transcript excerpts containing oral jury instructions:

R3.107 at 83-84;

R3.109 at 93;

R3.109 at 134;

R3.109 at 135;

R3.109 at 150;

R3.110 at 88

83

```
 1  will come in and what won't and talked about the Second
 2  Amendment, and there is an act here in Kansas known as
 3  the Second Amendment Protection Act, and that is not a
 4  defense to anything in this case but you need to know
 5  what it is so that you can put it in its proper
 6  context.
 7          And the Act states, in part, that a firearm
 8  accessory that is manufactured and owned in Kansas and
 9  that remains within the borders of Kansas is not
10  subject to any federal law, including any federal
11  firearm registration program under the authority of
12  Congress to regulate interstate commerce.  It's
13  declared by the Kansas legislature that those items
14  have not traveled in interstate commerce.
15          Now the National Firearms Act, which is the
16  federal law that Mr. Kettler, and Mr. Cox are charged
17  with violating in this case, was passed by Congress
18  under its authority to levy taxes and as I will explain
19  to you if you're on the jury, later in the case, one of
20  the elements of an offense under Section 5861 of the
21  National Firearms Act is that the Government has to
22  prove that Mr. Cox, Mr. Kettler knew of the
23  characteristics of the firearm they're charged with
24  possessing or that they made or transferred.  The
25  Government is not required to prove, though, a
```

84

1  defendant knew that the National Firearms Act required

2  the firearm to be registered.

3        So as I say, it's not a defense to a charge

4  under Section 5861 that either Mr. Cox or Mr. Kettler

5  may have believed that the NFA did not require

6  registration of a firearm, whether it's based on state

7  law or for some other reason, but it is out there, and

8  it's floating around, and I don't know if any of you

9  have any familiarity with these statutes or not, but I

10  would like to know with all of that in mind, is there

11  anyone -- and, Mr. Vossman, I'm going to start with

12  you, do you have strong feelings that would influence

13  you one way or the other in this case with respect to

14  firearms and their registration?

15        JUROR 1:  No, sir.

16        THE COURT:  All right.

17        Ms. Harris, how about you?

18        JUROR 2:  No.

19        THE COURT:  All right.

20        Ms. Aitchison?

21        JUROR 3:  No.

22        THE COURT:  Mr. Moore?

23        JUROR 4:  No, sir.

24        THE COURT:  Ms. Stiles?

25        JUROR 5:  No, sir.

469

```
1              Members of the jury, you have heard some
2    discussion over the course of this witness's testimony
3    about a Kansas law that I read yesterday when we were
4    picking a jury called the Second Amendment Protection
5    Act and the fact that Mr. Cox or Mr. Kettler may have
6    believed that they were insulated from liability by
7    virtue of that Act is not a factor that you can
8    consider in this case, in the sense that it is not a
9    defense to the charges that have been brought against
10   them.
11             In other words, any claim that we thought we
12   were protected by the Kansas -- or by the Second
13   Amendment Protection Act is not an excuse and doesn't
14   provide an excuse for violations of federal law.
15             And I have allowed the testimony about it
16   because it's all tied up in this case and the facts and
17   circumstances, but it does not provide a defense to
18   Mr. Cox or to Mr. Kettler.
19             All right.
20             Mr. Hathaway, any redirect?
21             MR. HATHAWAY:  No, Your Honor.  He can be
22   excused.
23             THE COURT:  Thank you very much.
24             You may step down.  You are excused.
25             THE WITNESS:  Thank you, Your Honor.
```

510

THE WITNESS:  -- they're still good.

THE COURT:  Sustained.

Members of the jury, let me tell you that what you are hearing right now is Mr. Cox's opinion as to what the law is as he understood it.

I will give you the law and the instructions, and as I have indicated to you previously, whatever a person's belief may have been about the Second Amendment Protection Act, that is the Kansas law, it is not a defense to the charges in this case.

So you can proceed now, Mr. Gradert

MR. GRADERT:  I will.  Thank you, Your Honor.

BY MR. GRADERT:

Q.    Did -- did you know that under federal law having a short barrelled rifle would be a violation of federal law?

A.    Apparently, um, now this is -- this is not -- I guess, it is a yes or no question?

Q.    Well, I mean, just really though --

A.    If I had bought one and especially one that had traveled across state lines, you need the tax stamp and -- and file your papers or whatever and but as -- as I understand it, the Kansas law, because of the -- the jurisdiction, it would appear that the federal government doesn't have jurisdiction unless it

511

crosses state lines, unless it's engaged in interstate

commerce.

          MR. HATHAWAY:  Judge, I object.

          THE COURT:  Once again, and I will sustain it.

          Members of the jury, again, Mr. Cox is

explaining what his understanding is of the law.  That

is not what the law is and, again, I will give it to

you in instructions and his view of the law you are not

to take as anything other than what his opinion was at

the time, which may go to his state of mind or what he

believed.

BY MR. GRADERT:

 Q.    Basically, Mr. Cox, did you -- did you think it

was okay for you to have the short barrelled rifle?

 A.    Absolutely.  Especially after checking with

local law enforcement.

 Q.    Okay.  Was -- was local --

 A.    And it's still my understanding.

       THE COURT:  Excuse me, there's no question on

the table right now, Mr. Cox.

BY MR. GRADERT:

 Q.    Mr. Cox --

          MR. GRADERT:  Oh, excuse me, Your Honor.

BY MR. GRADERT:

 Q.    Was there -- was local law enforcement aware

526

          Mr. Gradert?

## REDIRECT EXAMINATION

BY MR. GRADERT:

Q.    Well, Mr. Cox, just to give you a chance to

explain, when you were asked that question about being

aware of federal regulations, you are aware of those?

A.    I believe I'm aware of -- of all the

regulations, yes.

Q.    Then why did you think you could get around the

red tape?

A.    Because of this state law says that we are

exempt from -- from this if -- as long as the items are

made in the state and stay in the state.

          MR. HATHAWAY:  And I have to object, Your

Honor.

          THE COURT:  Well, I think Mr. Gradert just

asked him why he felt that he was exempt and he can

answer this.

          And, once again, members of the jury, as I've

told you at least three times now, his belief of the

law is not what's important here.

          MR. GRADERT:  And --

          THE COURT:  I will provide the law to you.

          MR. GRADERT:  And I think he finished the

answer, Your Honor, so I think I'm done.

627

1  Kansas is not subject to any federal law ... including

2  any federal firearm ... registration program, under the

3  authority of congress to regulate interstate commerce."

4         There is also a Kansas statute that prohibits

5  the "possessing of any device or attachment of any kind

6  designed, used or intended for use in suppressing the

7  report of any firearm," unless that person is in

8  compliance with the National Firearms Act.

9         Section 5861 of the National Firearms Act, the

10  federal law the defendants are charged with violating,

11  was passed by Congress under its authority to levy

12  taxes.  As you will see in the instructions, one of the

13  elements of an offense under Section 5861 is that a

14  defendant must have known of the characteristics of the

15  firearm that made it registrable.  The Government is

16  not required to prove, however, that a defendant knew

17  that the National Firearms Act required a firearm with

18  those characteristics to be registered.  For that

19  reason, it is not a defense to a charge under Section

20  5861 that a defendant may have believed, based on

21  Kansas law, that the National Firearms Act did not

22  require registration of a firearm.

23         Instruction Number 20.  The question of intent

24  is also a matter for you, as jurors, to determine.

25  Intent is a state of mind.  Since it is not possible to

Attachment:
# Judgment, R1.88

AO 245B    (Rev. 11/16 - D/KS 02/17)  Judgment in a Criminal Case

# United States District Court
## District of Kansas

UNITED STATES OF AMERICA

v.

Shane Cox

**JUDGMENT IN A CRIMINAL CASE**

Case Number:  6:15CR10150 - 001

USM Number:  25636-031

Defendant's Attorney:  Steven K. Gradert; Timothy J. Henry

## THE DEFENDANT:

☐    pleaded guilty to count(s):  ___ .

☐    pleaded nolo contendere to count(s) ___ which was accepted by the court.

☒    was found guilty on counts 3, 6, 7, 8, 9, 10, 11, and 12 of the First Superseding Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| See Next Page | | | |

The defendant is sentenced as provided in pages 1 through 7 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☒    The defendant has been found not guilty on counts 2 and 4 of the First Superseding Indictment.

☒    Counts 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, and 12 of the Indictment are dismissed on the motion of the United States.

IT IS ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States attorney of material changes in economic circumstances.

02/06/2017
Date of Imposition of Judgment

s/ J. Thomas Marten
Signature of Judge

Honorable J. Thomas Marten, Chief U.S. District Judge
Name & Title of Judge

February 6, 2017
Date

Appellate Case: 17-3034     Document: 01019798260     Date Filed: 08/22/2017     Page: 368

AO 245B     (Rev. 11/16 - D/KS 02/17) Judgment in a Criminal Case
Sheet 1

Judgment – Page **2** of **7**

DEFENDANT:     Shane Cox
CASE NUMBER:   6:15CR10150 - 001

# ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 26 U.S.C. § 5861(d) | POSSESSION OF UNREGISTRERED FIREARM, A Class C Felony | 02/04/2015 | 3 |
| 26 U.S.C. § 5861(e) | TRANSFER OF FIREARM IN VIOLATION OF NATIONAL FIREARM ACT, A Class C Felony | 02/04/2015 | 6 |
| 26 U.S.C. § 5861(e) | TRANSFER OF FIREARM IN VIOLATION OF NATIONAL FIREARM ACT, A Class C Felony | 02/04/2015 | 7 |
| 26 U.S.C. § 5861(e) | TRANSFER OF FIREARM IN VIOLATION OF NATIONAL FIREARM ACT, A Class C Felony | 02/04/2015 | 8 |
| 26 U.S.C. § 5861(e) | TRANSFER OF FIREARM IN VIOLATION OF NATIONAL FIREARM ACT, A Class C Felony | 02/04/2015 | 9 |
| 26 U.S.C. § 5861(f) | MAKING A FIREARM IN VIOLATION OF NATIONAL FIREARM ACT, A Class C Felony | 12/15/2014 | 10 |
| 26 U.S.C. § 5861(e) | TRANSFER OF FIREARM IN VIOLATION OF NATIONAL FIREARM ACT, A Class C Felony | 12/15/2014 | 11 |
| 26 U.S.C. § 5861(a) | ENGAGING IN BUSINESS AS A DEALER AND MANUFACTURER OF FIREARMS, A Class C Felony | 02/04/2015 | 12 |

Judgment – Page **3** of **7**

DEFENDANT:      Shane Cox
CASE NUMBER:    6:15CR10150 - 001

# PROBATION

You are hereby sentenced to probation for a term of <u>2 years</u>.

> Counts 3, 6, 7, 8, 9, 10, 11, and 12: 2 years on each count, to run concurrently; for a total of 2 years.

# MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.

2. You must not unlawfully possess a controlled substance.

3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of placement on probation and at least two periodic drug tests thereafter, as determined by the court.

   ☐ The above drug testing condition is suspended based on the court's determination that you pose a low risk of future substance abuse. *(Check if applicable.)*

4. ☒ You must cooperate in the collection of DNA as directed by the probation officer. *(Check if applicable.)*

5. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (<u>42 U.S.C. § 16901</u>, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. *(Check if applicable.)*

6. ☐ You must participate in an approved program for domestic violence. *(Check if applicable.)*

7. ☐ You must make restitution in accordance with <u>18 U.S.C. §§ 2248</u>, <u>2259</u>, <u>2264</u>, <u>2327</u>, <u>3663</u>, <u>3663A</u>, and <u>3664</u>. *(Check if applicable.)*

8. You must pay the assessment imposed in accordance with <u>18 U.S.C. § 3013</u>.

9. If this judgment imposes a fine, you must pay in accordance with the Schedule of Payments sheet of this judgment.

10. You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

AO 245B    (Rev. 11/16 - D/KS 02/17) Judgment in a Criminal Case
Sheet 4C — Probation

Judgment – Page **4** of **7**

DEFENDANT:    Shane Cox
CASE NUMBER:    6:15CR10150 - 001

# STANDARD CONDITIONS OF SUPERVISION

As part of your probation, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.    You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of the time you were sentenced, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2.    After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3.    You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4.    You must answer truthfully the questions asked by your probation officer.

5.    You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6.    You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7.    You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.    You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9.    If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10.    You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or Tasers).

11.    You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12.    If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

13.    You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. I understand additional information regarding these conditions is available at the www.uscourts.gov.

Defendant's Signature _____    Date _____

AO 245B   (Rev. 11/16 - D/KS 02/17)  Judgment in a Criminal Case
Sheet 4C — Supervision

Judgment – Page **5** of **7**

DEFENDANT:   Shane Cox
CASE NUMBER:   6:15CR10150 - 001

# SPECIAL CONDITIONS OF SUPERVISION

1.   You must submit your person, house, residence, vehicle(s), papers, business or place of employment and any property under your control to a search, conducted by the United States Probation Officer at a reasonable time and in a reasonable manner, based upon reasonable suspicion of contraband or evidence of a violation of a condition of release. Failure to submit to a search may be grounds for revocation. You must warn any other residents that the premises may be subject to searches pursuant to this condition.

Appellate Case: 17-3034     Document: 01019798260      Date Filed: 08/22/2017      Page: 134
Sheet 5 — Criminal Monetary Penalties

DEFENDANT:      Shane Cox
CASE NUMBER:   6:15CR10150 - 001

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the Schedule of Payments set forth in this Judgment.

| | **Assessment** | **JVTA Assessment*** | **Fine** | **Restitution** |
|---|---|---|---|---|
| **Totals:** | $800 | Not applicable | None | None |

☐      The determination of restitution is deferred until ___. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐      The defendant shall make restitution (including community restitution) to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss**** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| **Totals:** | $ | $ | |

☐      Restitution amount ordered pursuant to plea agreement $ ___ .

☐      The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options set forth in this Judgment may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐      The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐ the interest requirement is waived for the ☐ fine and/or ☐ restitution.

☐ the interest requirement for the ☐ fine and/or ☐ restitution is modified as follows:

*Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
**Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

AO 245B    (Rev. 11/16 - D/KS 02/17)  Judgment in a Criminal Case

Judgment – Page **7** of 7

DEFENDANT:    Shane Cox
CASE NUMBER:  6:15CR10150 - 001

# SCHEDULE OF PAYMENTS

Criminal monetary penalties are due immediately. Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties are due as follows, but this schedule in no way abrogates or modifies the government's ability to use any lawful means at any time to satisfy any remaining criminal monetary penalty balance, even if the defendant is in full compliance with the payment schedule:

A  ☐  Lump sum payment of $___ due immediately, balance due
    ☐ not later than ___, or
    ☐ in accordance with ☐ C, ☐ D, ☐ E, or ☐ F below; or

B  ☒  Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☒ F below); or

C  ☐  Payment in monthly installments of not less than 5% of the defendant's monthly gross household income over a period of ___ years to commence ___ days after the date of this judgment; or

D  ☐  Payment of not less than 10%  of the funds deposited each month into the inmate's trust fund account and monthly installments of not less than 5% of the defendant's monthly gross household income over a period of ____ years, to commence ___ days after release from imprisonment to a term of supervision;  or

E  ☐  Payment during the term of supervised release will commence within ____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F  ☒  Special instructions regarding the payment of criminal monetary penalties:

If restitution is ordered, the Clerk, U.S. District Court, may hold and accumulate restitution payments, without distribution, until the amount accumulated is such that the minimum distribution to any restitution victim will not be less than $25.

Payments should be made to Clerk, U.S. District Court, U.S. Courthouse - Room 204, 401 N. Market, Wichita, Kansas 67202.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐    Joint and Several

Defendant and Co-Defendant Names and Case Numbers (*including defendant number*), Total Amount, Joint and Several Amount and corresponding payee, if appropriate.

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|

☐    The defendant shall pay the cost of prosecution.

☐    The defendant shall pay the following court cost(s):

☒    The defendant shall forfeit the defendant's interest in the following property to the United States: All firearms and ammunition involved in the commission of the offense.

    Payments against any money judgment ordered as part of a forfeiture order should be made payable to the United States of America, c/o United States Attorney, Attn: Asset Forfeiture Unit, 1200 Epic Center, 301 N. Main, Wichita, Kansas 67202.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) fine interest, (6) community restitution, (7) JVTA assessment, (8) penalties, and (9) costs, including cost of prosecution and court costs.

Attachment:
# K.S.A. 50-1201–K.S.A. 50-1211

Appellate Case: 17-3034    Document: 01019858260    Date Filed: 08/21/2017    Page: 137

West's Kansas Statutes Annotated
Chapter 50. Unfair Trade and Consumer Protection
Article 12. Manufacturers of Firearms, Firearms Accessories, Ammunition

K.S.A. 50-1201

50-1201. Second amendment protection act

**Currentness**

K.S.A. 50-1201 through 50-1211, and amendments thereto, may be cited as the second amendment protection act.

**Credits**

Laws 2013, ch. 100, § 1, eff. April 25, 2013.

Notes of Decisions (3)

K. S. A. 50-1201, KS ST 50-1201

Statutes are current through laws effective on or before July 1, 2017, enacted during the 2017 Regular Session of the Kansas Legislature.

---

**End of Document**                                   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Appellate Case: 17-3034     Document: 01019858260     Date Filed: 08/21/2017     Page: 138

West's Kansas Statutes Annotated
    Chapter 50. Unfair Trade and Consumer Protection
        Article 12. Manufacturers of Firearms, Firearms Accessories, Ammunition

K.S.A. 50-1202

50-1202. Legislative declaration

Currentness

The legislature declares that the authority for K.S.A. 50-1201 through 50-1211, and amendments thereto, is the following:

(a) The tenth amendment to the constitution of the United States guarantees to the states and their people all powers not granted to the federal government elsewhere in the constitution and reserves to the state and people of Kansas certain powers as they were understood at the time that Kansas was admitted to statehood in 1861. The guaranty of those powers is a matter of contract between the state and people of Kansas and the United States as of the time that the compact with the United States was agreed upon and adopted by Kansas in 1859 and the United States in 1861.

(b) The ninth amendment to the constitution of the United States guarantees to the people rights not granted in the constitution and reserves to the people of Kansas certain rights as they were understood at the time that Kansas was admitted to statehood in 1861. The guaranty of those rights is a matter of contract between the state and people of Kansas and the United States as of the time that the compact with the United States was agreed upon and adopted by Kansas in 1859 and the United States in 1861.

(c) The second amendment to the constitution of the United States reserves to the people, individually, the right to keep and bear arms as that right was understood at the time that Kansas was admitted to statehood in 1861, and the guaranty of that right is a matter of contract between the state and people of Kansas and the United States as of the time that the compact with the United States was agreed upon and adopted by Kansas in 1859 and the United States in 1861.

(d) Section 4 of the bill of rights of the constitution of the state of Kansas clearly secures to Kansas citizens, and prohibits government interference with, the right of individual Kansas citizens to keep and bear arms. This constitutional protection is unchanged from the constitution of the state of Kansas, which was approved by congress and the people of Kansas, and the right exists as it was understood at the time that the compact with the United States was agreed upon and adopted by Kansas in 1859 and the United States in 1861.

**Credits**
Laws 2013, ch. 100, § 2, eff. April 25, 2013.

Notes of Decisions (3)

K. S. A. 50-1202, KS ST 50-1202

Appellate Case: 17-3034     Document: 01019858260     Date Filed: 08/21/2017     Page: 139

Statutes are current through laws effective on or before July 1, 2017, enacted during the 2017 Regular Session of the Kansas Legislature.

**End of Document**                                                     © 2017 Thomson Reuters. No claim to original U.S. Government Works.

West's Kansas Statutes Annotated
   Chapter 50. Unfair Trade and Consumer Protection
      Article 12. Manufacturers of Firearms, Firearms Accessories, Ammunition

K.S.A. 50-1203

50-1203. Definitions

Currentness

As used in K.S.A. 50-1201 through 50-1211, and amendments thereto, the following definitions apply:

(a) "Borders of Kansas" means the boundaries of Kansas described in the act for admission of Kansas into the union, 12 stat. 126, ch. 20, § 1.

(b) "Firearms accessories" means items that are used in conjunction with or mounted upon a firearm but are not essential to the basic function of a firearm, including, but not limited to, telescopic or laser sights, magazines, flash or sound suppressors, collapsible or adjustable stocks and grips, pistol grips, thumbhole stocks, speedloaders, ammunition carriers and lights for target illumination.

(c) "Manufacture" means to assemble using multiple components to create a more useful finished product.

**Credits**
Laws 2013, ch. 100, § 3, eff. April 25, 2013.

K. S. A. 50-1203, KS ST 50-1203
Statutes are current through laws effective on or before July 1, 2017, enacted during the 2017 Regular Session of the Kansas Legislature.

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

West's Kansas Statutes Annotated
  Chapter 50. Unfair Trade and Consumer Protection
    Article 12. Manufacturers of Firearms, Firearms Accessories, Ammunition

K.S.A. 50-1204

50-1204. Personal firearms, accessories and ammunition
manufactured in Kansas; exempt, interstate commerce

Currentness

(a) A personal firearm, a firearm accessory or ammunition that is manufactured commercially or privately and owned in Kansas and that remains within the borders of Kansas is not subject to any federal law, treaty, federal regulation, or federal executive action, including any federal firearm or ammunition registration program, under the authority of congress to regulate interstate commerce. It is declared by the legislature that those items have not traveled in interstate commerce. This section applies to a firearm, a firearm accessory or ammunition that is manufactured commercially or privately and owned in the state of Kansas.

(b) Component parts are not firearms, firearms accessories or ammunition, and their importation into Kansas and incorporation into a firearm, a firearm accessory or ammunition manufactured and owned in Kansas does not subject the firearm, firearm accessory or ammunition to federal regulation. It is declared by the legislature that such component parts are not firearms, firearms accessories or ammunition and are not subject to congressional authority to regulate firearms, firearms accessories and ammunition under interstate commerce as if they were actually firearms, firearms accessories or ammunition.

(c) Firearms accessories that are imported into Kansas from another state and that are subject to federal regulation as being in interstate commerce do not subject a firearm to federal regulation under interstate commerce because they are attached to or used in conjunction with a firearm in Kansas.

**Credits**

Laws 2013, ch. 100, § 4, eff. April 25, 2013.

Notes of Decisions (6)

K. S. A. 50-1204, KS ST 50-1204
Statutes are current through laws effective on or before July 1, 2017, enacted during the 2017 Regular Session of the Kansas Legislature.

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Appellate Case: 17-3034    Document: 01019858260    Date Filed: 08/21/2017    Page: 142

West's Kansas Statutes Annotated
   Chapter 50. Unfair Trade and Consumer Protection
      Article 12. Manufacturers of Firearms, Firearms Accessories, Ammunition

K.S.A. 50-1205

50-1205. Firearms manufactured in Kansas; stamped requirement

Currentness

A firearm manufactured in Kansas within the meaning of K.S.A. 50-1201 through 50-1211, and amendments thereto, must have the words "Made in Kansas" clearly stamped on a central metallic part, such as the receiver or frame.

**Credits**

Laws 2013, ch. 100, § 5, eff. April 25, 2013.

Notes of Decisions (3)

K. S. A. 50-1205, KS ST 50-1205
Statutes are current through laws effective on or before July 1, 2017, enacted during the 2017 Regular Session of the Kansas Legislature.

---

**End of Document**                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

West's Kansas Statutes Annotated
    Chapter 50. Unfair Trade and Consumer Protection
        Article 12. Manufacturers of Firearms, Firearms Accessories, Ammunition

K.S.A. 50-1206

50-1206. Certain federal laws made inapplicable; prohibition against enforcement

Currentness

(a) Any act, law, treaty, order, rule or regulation of the government of the United States which violates the second amendment to the constitution of the United States is null, void and unenforceable in the state of Kansas.

(b) No official, agent or employee of the state of Kansas, or any political subdivision thereof, shall enforce or attempt to enforce any act, law, treaty, order, rule or regulation of the government of the United States regarding any personal firearm, firearm accessory or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains within the borders of Kansas.

**Credits**
Laws 2013, ch. 100, § 6, eff. April 25, 2013.

Notes of Decisions (3)

K. S. A. 50-1206, KS ST 50-1206
Statutes are current through laws effective on or before July 1, 2017, enacted during the 2017 Regular Session of the Kansas Legislature.

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

West's Kansas Statutes Annotated
    Chapter 50. Unfair Trade and Consumer Protection
        Article 12. Manufacturers of Firearms, Firearms Accessories, Ammunition

K.S.A. 50-1207

50-1207. Criminal penalty; certain actions of federal officials

Currentness

It is unlawful for any official, agent or employee of the government of the United States, or employee of a corporation providing services to the government of the United States to enforce or attempt to enforce any act, law, treaty, order, rule or regulation of the government of the United States regarding a firearm, a firearm accessory, or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains within the borders of Kansas. Violation of this section is a severity level 10 nonperson felony. Any criminal prosecution for a violation of this section shall be commenced by service of complaint and summons upon such official, agent or employee. Such official, agent or employee shall not be arrested or otherwise detained prior to, or during the pendency of, any trial for a violation of this section.

**Credits**

Laws 2013, ch. 100, § 7, eff. April 25, 2013.

K. S. A. 50-1207, KS ST 50-1207
Statutes are current through laws effective on or before July 1, 2017, enacted during the 2017 Regular Session of the Kansas Legislature.

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

 © 2017 Thomson Reuters. No claim to original U.S. Government Works.

West's Kansas Statutes Annotated
    Chapter 50. Unfair Trade and Consumer Protection
        Article 12. Manufacturers of Firearms, Firearms Accessories, Ammunition

K.S.A. 50-1208

50-1208. Kansas prosecutors; injunctive relief

Currentness

A county or district attorney, or the attorney general, may seek injunctive relief in any court of competent jurisdiction to enjoin any official, agent or employee of the government of the United States or employee of a corporation providing services to the government of the United States from enforcing any act, law, treaty, order, rule or regulation of the government of the United States regarding a firearm, a firearm accessory, or ammunition that is manufactured commercially or privately and owned in the state of Kansas and that remains within the borders of Kansas.

**Credits**
Laws 2013, ch. 100, § 8, eff. April 25, 2013.

K. S. A. 50-1208, KS ST 50-1208
Statutes are current through laws effective on or before July 1, 2017, enacted during the 2017 Regular Session of the Kansas Legislature.

**End of Document**    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

West's Kansas Statutes Annotated
    Chapter 50. Unfair Trade and Consumer Protection
        Article 12. Manufacturers of Firearms, Firearms Accessories, Ammunition

---

K.S.A. 50-1209

50-1209. Firearms; exclusions

Currentness

K.S.A. 50-1201 through 50-1211, and amendments thereto, do not apply to:

(a) A firearm that cannot be carried and used by one person;

(b) ammunition with a projectile that explodes using an explosion of chemical energy after the projectile leaves the firearm; or

(c) other than shotguns, a firearm that discharges two or more projectiles with one activation of the trigger or other firing device.

**Credits**

Laws 2013, ch. 100, § 9, eff. April 25, 2013.

K. S. A. 50-1209, KS ST 50-1209
Statutes are current through laws effective on or before July 1, 2017, enacted during the 2017 Regular Session of the Kansas Legislature.

---

**End of Document**                                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

West's Kansas Statutes Annotated
  Chapter 50. Unfair Trade and Consumer Protection
    Article 12. Manufacturers of Firearms, Firearms Accessories, Ammunition

K.S.A. 50-1210

50-1210. Application of act

Currentness

K.S.A. 50-1201 through 50-1211, and amendments thereto, apply to firearms, firearms accessories and ammunition that are manufactured, as defined in K.S.A. 50-1203, and amendments thereto, owned and remain within the borders of Kansas on and after October 1, 2009.

**Credits**
Laws 2013, ch. 100, § 10, eff. April 25, 2013.

K. S. A. 50-1210, KS ST 50-1210
Statutes are current through laws effective on or before July 1, 2017, enacted during the 2017 Regular Session of the Kansas Legislature.

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.     1

Appellate Case: 17-3034     Document: 01019858260     Date Filed: 08/21/2017     Page: 148

West's Kansas Statutes Annotated
    Chapter 50. Unfair Trade and Consumer Protection
        Article 12. Manufacturers of Firearms, Firearms Accessories, Ammunition

K.S.A. 50-1211

50-1211. Severability

Currentness

If any provision of K.S.A. 50-1201 through 50-1210, and amendments thereto, or the application to any persons or circumstances is held to be invalid, such invalidity shall not affect the other provisions or application of K.S.A. 50-1201 through 50-1210, and amendments thereto, and to this end the provisions of K.S.A. 50-1201 through 50-1210, and amendments thereto, are declared to be severable.

**Credits**
Laws 2013, ch. 100, § 11, eff. April 25, 2013.

Notes of Decisions (3)

K. S. A. 50-1211, KS ST 50-1211
Statutes are current through laws effective on or before July 1, 2017, enacted during the 2017 Regular Session of the Kansas Legislature.

**End of Document**                           © 2017 Thomson Reuters. No claim to original U.S. Government Works.